[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-12568

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

DR. JAMES HEATON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 2:18-cr-00009-RWS-JCF-3

_____

Before WILSON, JILL PRYOR, and HULL, Circuit Judges.

HULL, Circuit Judge:

After a jury trial, Dr. James Heaton appeals his convictions for 27 counts of aiding and abetting the acquisition of controlled substances by deception and 102 counts of unlawfully dispensing controlled substances. On appeal, Heaton argues that the jury instructions were improper and his statute of conviction, 21 U.S.C. § 841(a), was unconstitutionally vague. After review, and with the benefit of oral argument, we affirm Heaton's convictions.

## I. BACKGROUND

Heaton was a family practice physician in the small town of Blairsville, Georgia. Heaton primarily treated geriatric patients, but over time the number of his patients declined. Heaton's practice then saw an increasing number of chronic pain patients.

This case involves the large volume of prescriptions for controlled substances that Heaton wrote for three pain patients: (1) Michael Gowder and (2) two women patients referred to here as T.G. and H.J.W. From 2013 through 2015, Heaton prescribed these three patients thousands of pain pills, including hydrocodone, oxycodone, and methadone.

Gowder, who was a health care administrator, was not only Heaton's so-called "pain patient," but also was charged as a codefendant for his role in aiding and abetting Heaton's unlawful dispensing of controlled substances and for Gowder's acquiring controlled substances by deception. The jury found Gowder

guilty, and he did not appeal.  This appeal involves only Heaton and his convictions.

Below, we describe Heaton's practice, his prior interactions with the Georgia Medical Board ("Medical Board"), his relationships with the three pain patients, and the federal investigation into his prescriptions for controlled substances.

## A.    Heaton's Practice

In the late 1990s, Heaton operated a general family practice and rented space to other doctors.  In 2011 or 2012, Heaton moved his practice into a smaller office, where he saw an increasing number of younger patients and patients with chronic pain issues.

As part of his practice, Heaton operated a sleep study business.  Heaton rented the building for his practice from the Union General Hospital (the "Hospital").  Heaton also served as the medical director of the Hospital's nursing home.

## B.    The Patient Pain Contracts

In 2010, Heaton had a matter before the Medical Board.[1]  In connection with that matter, Heaton provided the Medical Board with two forms that he reportedly gave to patients who were prescribed controlled substances for pain.  Heaton informed the

---

[1] The details of that matter were not presented in the trial evidence.  The Medical Board has since changed its name to the Composite State Board of Medical Examiners.

Medical Board that all of the pain patients at his clinic were required to fill out both forms.

Heaton's form contracts provided that patients agreed: (1) not to ask for prescriptions to be filled early, (2) not to ask for the dosage or frequency of medications to be increased, and (3) that any breach of the contract could result in the patient's dismissal from Heaton's practice.[2] Heaton's records for Gowder, T.G., and H.J.W. did not contain these contracts.

## C.    Michael Gowder

Gowder, Heaton's codefendant, had been Heaton's patient since the 1990s. While Gowder testified in his defense case, the government's evidence about Heaton's controlled substance prescriptions for Gowder, recounted below, came from other

---

[2] One of the forms was a patient pain contract, containing these terms:

> I, _____, understand, agree with, and will comply with the following rules pertaining to my medications.
>
> I will not ask for my medications to be filled early.
>
> I will not ask for the dosage or frequency of my medications to be increased.
>
> . . . .
>
> Any breech [sic] of this contract could result in my being dismissed as a patient from Blairsville [F]amily Practice.
>
> _____          _____
>
> Patient                            Physician

witnesses, patients' files, medical records, and the database records of the prescription drug monitoring program ("PDMP").

Starting in January 2012, Heaton prescribed Gowder 40 pills of hydrocodone 10 milligrams (mg) to treat Gowder's back and leg pain.

As outlined in detail later, the dosage, quantity, and potency of Gowder's pain prescriptions increased over time. By June 2012, Heaton had increased Gowder's monthly prescription to 120 pills of oxycodone 30 mg. From July 2012 to November 2012, Heaton prescribed Gowder two prescriptions per month, each for 120 or 150 pills of hydrocodone 10 mg or oxycodone 30 mg. By 2013, Heaton was writing Gowder two or three prescriptions, each for 150 pills of oxycodone, nearly every month.

Gowder filled these prescriptions at pharmacies in Georgia, Tennessee, and North Carolina.[3]

On January 1, 2013, Gowder, who was a health care administrator, became the Hospital's chief executive officer ("CEO"). That same day, Gowder increased Heaton's salary as medical director of the Hospital's nursing home by $1,000 a month. A Hospital employee testified that he saw Heaton at the nursing home "very infrequently."

---

[3] At this time, the PDMPs in Georgia, North Carolina, and Tennessee did not share information, so the pharmacists checking their state's PDMP records would not have learned that Michael Gowder was filling multiple prescriptions for the same or similar drugs each month in different states.

Nearly every month between May 2013 and June 2015, Heaton wrote Gowder two prescriptions, each for oxycodone 30 mg. During that time period, Heaton also wrote Gowder a prescription for Percocet 10 mg most months.[4] For example, in January 2014, Heaton issued Gowder: (1) a prescription for 150 pills of oxycodone 30 mg on January 14th; and (2) prescriptions for 150 pills of oxycodone 30 mg and 150 pills of Percocet 10 mg on January 24th. In total, Heaton prescribed more than 15,000 pain pills to Gowder between January 2012 and June 2015.

Lisa Kelley worked at Heaton's office from the late 1990s to 2015. Kelley testified that, to her knowledge, Gowder never paid for an office visit with Heaton. Kelley never collected a co-pay from Gowder, who did not make an appointment when he visited Heaton's office.

Instead, at least once a month, Gowder came through the back door of Heaton's clinic at closing time and met with Heaton in his private office to pick up a prescription. On some of these visits, Gowder brought a check from the Hospital payable to Heaton, who deposited these checks in his personal account. From April 2013 to December 2015, while Gowder was the CEO, the Hospital issued checks totaling $342,500 to Heaton, some of which Gowder delivered personally.

---

[4] The Percocet contained oxycodone 10 mg mixed with Tylenol.

In January 2014, Gowder, in his capacity as the Hospital's CEO, purchased Heaton's sleep clinic for $155,000. After this deal, Gowder instructed Hospital employees to reduce Heaton's $3,200 monthly rent for his office space by $1,000 because the sleep study was being housed there.

### D.    Patient-Witness T.G.

Patient T.G. testified that she had struggled with drug addiction. T.G. expressly told Heaton that she was a former heroin abuser before she became his patient. T.G. had track marks on her arms where she injected heroin. At trial, T.G. showed these track marks to the jury.

Prior to becoming Heaton's patient, T.G. was prescribed pain medication after she broke her back in a car accident when she was 11 years old. When T.G. asked her original treating physician for a higher dose of pain pills, that physician refused to prescribe a stronger dose.

In September 2010, T.G. became Heaton's patient. During T.G.'s first visit, Heaton prescribed her 120 pills of Lortab 10 mg.[5] Heaton never told T.G. that the drugs could be habit-forming or dangerous, and he never conducted a urine screen. Although Heaton checked a bulging disk in T.G.'s neck, he never conducted a full physical examination of T.G.

---

[5] The Lortab 10 mg contained hydrocodone 10 mg mixed with Tylenol.

T.G. sometimes asked Heaton for refills on her pain medication before her prescriptions ran out.  When T.G. asked Heaton for a refill, she would pick it up from his house or his office.

In July 2011, Heaton began to prescribe T.G. 90 pills of methadone 10 mg.  By October 2012, Heaton had increased T.G.'s prescription to 150 pills of methadone 10 mg.

T.G. was using methamphetamine and drinking heavily while being prescribed pain medications by Heaton.  Over a five-month period, T.G. was arrested for driving under the influence ("DUI") three times.  She served a four-month sentence for her third DUI.

T.G. testified that: (1) she told Heaton that she had been to jail and that she was arrested for multiple DUIs, but (2) Heaton never warned her that she was at risk of an overdose after going without opiates for so long or that it was dangerous to consume alcohol while taking her pain medication.

In June 2014, after T.G. was released from jail, Heaton even prescribed her the same amount of pain medication that he had prescribed before she was incarcerated (150 pills of methadone 10 mg).

To make matters even worse, Heaton and T.G. had a sexual relationship that began before T.G. became Heaton's patient and continued during the time Heaton was prescribing her controlled substances.  Heaton and T.G. often would have sex when T.G. asked for an early refill before her prescriptions ran out.  T.G.

testified that she had sex with Heaton at his house or his office after hours. At trial, T.G. identified Heaton's bedroom from pictures introduced by the government.

After T.G. was arrested for violating her probation, she began to cooperate with law enforcement. At the request of law enforcement, T.G. texted Heaton in January 2016 and asked for a prescription for controlled substances. Heaton responded: "Can only write controlled substances at office visit, rules have changed, has to be documented, it's crazy now." T.G. explained that, when she had texted Heaton in the past, he would write her a prescription.

### E.     Patient-Witness H.J.W.

Patient H.J.W. became Heaton's patient starting in May 2014. At H.J.W.'s first appointment, H.J.W. asked Heaton to prescribe hydrocodone and Heaton wrote a monthly prescription for 60 pills of Lortab 7.5 mg[6] to H.J.W. to treat her lower abdominal pain (eventually diagnosed as Crohn's disease and fibromyalgia). In August 2014, H.J.W. visited Heaton again, complaining of knee and back pain. At H.J.W.'s request, Heaton doubled her monthly dose to 120 pills of Lortab 7.5 mg.

In October 2014, Heaton prescribed H.J.W. cough syrup after she presented with a sore throat. Heaton also issued H.J.W. a prescription for 120 pills of Lortab 7.5 mg, but he did not inform

---

[6] The Lortab 7.5 mg contained hydrocodone 7.5 mg mixed with Tylenol.

H.J.W. about any risks associated with taking Lortab (which contains hydrocodone) and cough syrup at the same time. In December 2014, at H.J.W.'s request, Heaton later increased her monthly dosage to 120 pills of Lortab 10 mg.

H.J.W. began to buy hydrocodone pills off the street a year after she started seeing Heaton. In March 2015, H.J.W. told Heaton that she had begun buying pills from other people. Heaton responded that H.J.W. "could not do that" because (1) buying pills off the street was illegal and (2) Heaton could not regulate H.J.W.'s medications if he did not know the dosage she was taking. Heaton said that H.J.W. could continue with her pain medication or switch to Suboxone[7] if she wanted to stop taking her pain medication.

At Heaton's urging, H.J.W. signed a document, which stated "I will get my meds from only Dr. Heaton." The document also stated, "will titrate down" and was initialed by Heaton.

In March 2015, Heaton noted in H.J.W.'s patient file that she was receiving seven Lortab 10 mg a day and that he would "work her down one a day every two weeks" until H.J.W. was no longer taking Lortab. In April 2015, Heaton noted that he had reduced H.J.W.'s prescription to five Lortab 10 mg a day.

Starting in May 2015, however, Heaton switched H.J.W.'s medication from Lortab 10 mg to the more potent oxycodone 15 mg, prescribing her 120 pills of oxycodone 15 mg. Heaton never

---

[7] Suboxone is a medication-assisted treatment for opioid addiction.

referred H.J.W. to a specialist or insisted that she seek drug treatment.

### F.    Patient-Witness H.B.W.

Patient H.B.W. testified as a government witness.[8] H.B.W.'s testimony was admitted pursuant to Federal Rule of Evidence 404(b) to show Heaton's intent to commit the charged crimes.

H.B.W. was Heaton's pain patient from March 2011 to January 2012. At her first appointment, H.B.W. told Heaton that she was struggling with parenthood and owning a business. Heaton prescribed Xanax to H.B.W. to treat her anxiety. H.B.W. eventually became addicted to Xanax and began to buy it off the street. While H.B.W. was Heaton's patient, she and Heaton had a sexual relationship that lasted from mid-2011 until January 2012.

H.B.W.'s husband filed a complaint against Heaton with the Medical Board, which investigated Heaton's prescribing practices and his sexual affair with H.B.W. In May 2014, Heaton told a Medical Board investigator that he had prescribed controlled substances to H.B.W. but claimed that his sexual relationship with her began after he "terminated her" as a patient.

At some point H.B.W. and her husband stopped communicating with the Medical Board's investigator. In July

---

[8] Two of Heaton's former patients have the initials "H.W.," so we refer to these patients using their middle initials.

2014, the Medical Board closed Heaton's case with no disciplinary action. The Medical Board, however, issued a letter of concern to Heaton regarding its "boundary with patients" rule, which prohibits physicians from having sexual relationships with their patients.

### G.    Federal Investigation

In July 2015, Drug Enforcement Administration ("DEA") Agent Jason Allen began to investigate suspected drug diversion in Blairsville, Georgia after Dr. George David Gowder was arrested trying to fill fraudulent prescriptions. George David Gowder is the brother of Heaton's codefendant Michael Gowder, the Hospital's CEO.[9] Agent Allen began to investigate Heaton after learning that Heaton issued Michael Gowder numerous prescriptions for oxycodone 30 mg.

In September 2015, Agent Allen and a Medical Board investigator met with Heaton. At this meeting, the Medical Board investigator subpoenaed Heaton's patient file for Michael Gowder. Agent Allen, who reviewed this patient file, stated that it was "very light" compared to a typical patient file.

A few weeks later, Agent Allen served a DEA subpoena on Heaton for this same Michael Gowder file, which now contained

---

[9] Before Heaton and Michael Gowder's trial, George David Gowder pled guilty to unlawfully dispensing controlled substances and was sentenced to eighteen months' imprisonment. After trial, Michael Gowder was sentenced to a term of imprisonment of one year and one day.

two MRI reports from 2011 and 2015 and a radiology report from 2006. Agent Allen did not see any of these reports in this file when Heaton provided it to the Medical Board.

During his investigation, Agent Allen interviewed T.G., who was wearing a short sleeve shirt and "had very obvious track marks" on both arms.

In March 2016, Heaton was arrested. During the arrest, Agent Allen accompanied Heaton to his bedroom so that Heaton could change his clothes. Agent Allen told Heaton that his bedroom matched a description given by one of his patients. Heaton responded that patients came over to his house from time to time.

## II.    INDICTMENT & TRIAL

In March 2019, a second superseding indictment charged Heaton with 1 count of conspiracy to unlawfully distribute and dispense controlled substances, in violation of 21 U.S.C. §§ 841(b)(1)(C), 843, & 846 (Count 1); 102 substantive counts of unlawful dispensing of controlled substances to Gowder (Counts 2-76) and to T.G. and H.J.W. (Counts 104-130), all in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and 27 counts of aiding and abetting Gowder's acquisition of controlled substances by deception, in

violation of 21 U.S.C. § 843(a)(3) and 18 U.S.C. § 2 (Counts 77-103).[10]

As to the 102 substantive § 841(a) counts, the indictment alleged that Heaton unlawfully prescribed controlled substances to: (1) Michael Gowder from May 1, 2013, to June 16, 2015 (Counts 2-76); (2) T.G. from September 16, 2014, to August 18, 2015 (Counts 104-115); and (3) H.J.W. from October 15, 2014, to September 11, 2015 (Counts 116-130).

During Heaton and Michael Gowder's eight-day jury trial, the government presented thirteen witnesses and overwhelming evidence of Heaton's unlawful dispensation of controlled substances. The government's witnesses included former employees of Heaton's practice and the Hospital, Agent Allen, two Medical Board investigators, three of Heaton's patients (T.G., H.J.W., and H.B.W.), and an expert witness on pain management. The evidence also included hundreds of pages of patient files, medical records, prescription documents, charts from the PDMP databases, and photographs.

While the above evidence covers Heaton's interactions with the Medical Board and his patients, we now outline the expert

---

[10] During Heaton's criminal proceedings, the trial court dismissed more than seventy counts from the second superseding indictment. At the trial court's direction, the government prepared a "dummy" indictment, which omitted the dismissed charges. This dummy indictment was submitted to the jury during deliberations. The counts referenced in this opinion are as numbered in the dummy indictment.

testimony about how Heaton prescribed pain pills for no legitimate medical purpose and outside the scope of professional practice.

## A.    Dr. Gary Kaufman

The government called Dr. Gary Kaufman as an expert witness.  Dr. Kaufman, a board-certified physician in pain medicine and neurosurgery, ran a pain management clinic in Brunswick, Georgia for thirteen years.  He reviewed the patient files and PDMP records for eleven of Heaton's patients, including Michael Gowder, T.G., and H.J.W.  Dr. Kaufman described the Medical Board's rules governing the prescription of controlled substances and explained how Heaton did not follow them.

Dr. Kaufman testified that the Medical Board has adopted "commonsense" rules of professional conduct that all physicians must follow.  Under these rules, "unprofessional conduct" includes: (1) failing to maintain appropriate records for patients being prescribed controlled substances; (2) having personal or sexual relationships with patients; and (3) prescribing controlled substances to known or suspected drug abusers in the absence of a substantial justification.

Additionally, the Medical Board requires that physicians: (1) obtain a patient's medical history, conduct a physical examination, and receive informed consent before prescribing pain medications; (2) obtain or make a diligent effort to obtain a patient's prior medical records; (3) create a treatment plan; (4) determine whether conservative treatment, including non-

controlled medicines, is appropriate before prescribing opioids; (5) have a treatment agreement with the patient if the patient is prescribed hydrocodone, oxycodone, or similar substances for longer than ninety days; (6) monitor a patient's use of the controlled substances by randomly checking bodily fluids (i.e., urine screens) at least four times a year; and (7) create a record showing evaluation and monitoring of the patient and the rationale for continuing or modifying the therapy.

Dr. Kaufman explained that the treatment of pain can constitute a legitimate medical purpose for prescribing controlled substances. But if a doctor determines that a patient is abusing the medication, the issuance of pain medications is no longer legitimate, and the doctor must make an appropriate referral for treatment of substance abuse.

The Medical Board requires doctors who prescribe controlled substances to "document everything." Dr. Kaufman observed: "If it's not written, it didn't happen."

Based on his review of Heaton's patient files for Michael Gowder, T.G., and H.J.W., Dr. Kaufman testified that Heaton regularly: (1) failed to conduct credible physical examinations; (2) did not monitor patient compliance with prescribed medications; (3) did not review PDMP records; (4) did not obtain prior medical records relating to pain complaints; and (5) did not properly document the prescriptions that he issued to these patients.

According to Dr. Kaufman, the physical exams documented in Heaton's files were not "authentic" because (1) Heaton repeatedly failed to fill out important blanks in the electronic template, and (2) Heaton copied and pasted the same information on the templates for the completed parts of the template, even though that information likely would have changed from visit to visit. Ultimately, after reviewing all of the patient files and prescriptions, Dr. Kaufman opined that Heaton prescribed pain medications to Michael Gowder, T.G., and H.J.W. without a legitimate medical purpose and outside the usual course of professional practice.

Here's what Dr. Kaufman specifically testified about based on his review of Heaton's patient files for Gowder, T.G., and H.J.W. and the prescriptions that Heaton wrote to each of these patients.

## B.     Dr. Kaufman as to Prescriptions for Michael Gowder

Even though Heaton wrote more than 100 prescriptions for Michael Gowder, Heaton's patient file for Gowder usually did not document those prescriptions with any notation in the file about what he had prescribed. Heaton's records for Gowder accounted for only five of these prescriptions.

Dr. Kaufman explained that more than 100 prescriptions to Michael Gowder were missing from Heaton's records. Significantly too, apart from two MRI reports, Heaton's patient file

for Gowder did not contain prior records of Gowder's pain complaints or indicate that Heaton attempted to get those records.

The PDMP records showed that Heaton prescribed hydrocodone 10 mg to Gowder for six months from January 2012 to June 2012. However, the first note in Heaton's file for Gowder relating to controlled substances was dated June 12, 2012. In this June 12, 2012 note, Heaton wrote that he planned to prescribe Gowder 120 pills of oxycodone 30 mg to treat Gowder's back pain. While Dr. Kaufman did not doubt Gowder was experiencing back pain from his previous back surgery, Dr. Kaufman testified that this pain did not provide Heaton with a legitimate medical reason to be prescribing 120 pills of oxycodone 30 mg.

In July and August 2012, Heaton continued to issue the same prescription for 120 pills of oxycodone 30 mg to Gowder without noting in Gowder's file that he had collected Gowder's medical history, conducted a physical exam, or monitored Gowder's compliance with the prescribed medications. From September to December 2012, Heaton wrote Gowder monthly prescriptions for 120 pills and then 150 pills of oxycodone 30 mg.

In sum, in 2012, Heaton increased the dosage, strength, and quantity of Gowder's monthly medications from 40 pills of hydrocodone 10 mg in January 2012 to 150 pills of oxycodone 30 mg in December 2012, without documenting why he was increasing Gowder's medications. Heaton also routinely prescribed "extra" or early prescriptions to Gowder for a 30-day

supply of 120 or 150 pills of oxycodone 30 mg roughly every 2 weeks.[11]

In January 2013, Heaton also started to issue Gowder prescriptions for 150 pills of Percocet 10 mg. Heaton noted that he was prescribing Percocet to treat Gowder's "breakthrough pain." Dr. Kaufman, however, testified that (1) Percocet can treat "breakthrough pain" that arises when a long-acting medication wears off too soon, but (2) oxycodone 30 mg was not a long-acting medication, so Gowder did not need a prescription for breakthrough pain.

By May 2013, Heaton each month was prescribing Gowder two prescriptions, each for 150 pills of oxycodone 30 mg, and one prescription for 150 pills of Percocet 10 mg. Dr. Kaufman explained that Heaton in effect was prescribing Gowder the equivalent of a daily dose of 450 milligram morphine, or a milligram morphine equivalent ("MME") of 450. Under these circumstances, Dr. Kaufman would have suspected that Gowder was a drug addict or was diverting his medication.

On June 13, 2013, Heaton noted in the file that he had prescribed 120 pills of oxycodone 30 mg to Gowder. The PDMP records, however, showed that since January 2013 Heaton had

---

[11] Gowder also obtained "extra" prescriptions for 120 pills of hydrocodone 10 mg in August 2012 and 150 pills of Percocet 10 mg throughout 2013, 2014, and 2015.

written Gowder multiple prescriptions, each for 150 pills of oxycodone 30 mg.

In 2014, Heaton documented only one office visit for Gowder, despite the Medical Board's requirement to see a patient who is taking opioids once every three months. Dr. Kaufman testified that Heaton's note for that one 2014 visit was "deceptive" because Heaton indicated he was treating Gowder using "conservative measures" without acknowledging the extensive pain medication being prescribed to Gowder.

From June 18, 2014 to July 16, 2014, Heaton issued Gowder three oxycodone prescriptions, each for 150 pills of oxycodone 30 mg, and one prescription for 150 pills of Percocet 10 mg. In effect, Heaton was prescribing Gowder the equivalent of 885 MME per day, a "very high" daily dose that would kill the average person, but that an addicted person might be able to consume. Dr. Kaufman testified that: (1) it was generally recommended that physicians in general practice not prescribe more than 50 or 100 MME per day; and (2) Dr. Kaufman had never prescribed a patient more than 500 MME a day and only prescribed 250 MME to 5 or 10 patients in his entire career.

Dr. Kaufman also reviewed records from Gowder's visits with two specialists in 2015. During a visit with a cardiologist in June 2015, Gowder reported "some increasing low back pain" over the past three to four months. In December 2015, Gowder saw a neurologist and reported numbness and moderate-to-severe pain. Dr. Kaufman explained that this amount of pain would not have

warranted the pain medications that Heaton prescribed to Gowder.

## C.    Dr. Kaufman as to Prescriptions for T.G.

Turning to T.G., Dr. Kaufman explained that Heaton did not document in T.G.'s patient file that he: (1) took a complete medical history from T.G.; (2) conducted an adequate physical examination; (3) obtained informed consent; (4) monitored T.G.'s compliance with her prescribed medications; (5) tried to acquire T.G.'s prior records; or (6) diagnosed her pain. Although T.G.'s patient file included some early prescriptions, Heaton did not document all of the many prescriptions that he wrote to T.G.

During T.G.'s first visit in September 2010, Heaton prescribed her 60 pills of Lortab 5 mg without obtaining her prior medical records or providing informed consent. Dr. Kaufman testified that Heaton's records for this visit contained a "very, very suboptimal amount of information" about Heaton's physical examination of T.G. and an "inadequate" medical history. In October 2010, Heaton increased T.G.'s prescription to 90 pills of Lortab 5 mg.

Over the next six months, Heaton increased the quantity and potency of T.G.'s monthly pain medication from 90 pills of Lortab 5 mg in October 2010 to 90 pills of oxycodone 10 mg in March 2011. Heaton did not document T.G.'s response to the medication or indicate that he had conducted a "definitive" physical examination. Although T.G. consistently reported muscle

spasms, Heaton did not treat that issue, prescribing controlled substances instead.

In May 2011, Heaton gave T.G. an early prescription for oxycodone 10 mg after she reported that her medications were stolen. Heaton noted "Meds stolen at work," without verifying whether T.G.'s medications were actually stolen. Dr. Kaufman testified that physicians must be "very strict" and should not replace medicines without a "real reason."

In July 2011, Heaton changed T.G.'s prescription to 90 pills of methadone 10 mg, noting in her file that she could not afford oxycodone and "was on methadone in New Jersey." As a result of switching to methadone, T.G.'s daily MME increased from 45 to 240, which was "way above the dangerous level."[12] Dr. Kaufman testified that Heaton increased T.G.'s prescription "for no apparent reason except that she went to New Jersey and it was cheaper."

In October 2012, Heaton increased T.G.'s monthly prescription for methadone 10 mg from 120 pills to 150 pills without explanation.

In June 2014, Heaton noted that T.G. had gotten a DUI. Heaton, however, prescribed T.G. the same monthly prescription for 150 pills of methadone 10 mg that he had issued to her before she went to jail without warning T.G. that she could die if she

---

[12] Dr. Kaufman testified that hydrocodone has the same potency as morphine, oxycodone is one and a half times as strong as morphine, and methadone is eight times as strong as morphine.

continued to drink and use opioids. According to Dr. Kaufman, this prescription put T.G. at "extreme risk" and was "very dangerous." Dr. Kaufman testified that Heaton failed to follow the Medical Board's requirements and that his practices went "way beyond poor recordkeeping."

### D.    Dr. Kaufman as to Prescriptions for H.J.W.

Regarding H.J.W., Dr. Kaufman expressed similar concerns about Heaton's prescribing practices, starting with H.J.W.'s first visit in May 2014. During this visit, Heaton prescribed 60 pills of Lortab 7.5 mg to H.J.W., without obtaining an adequate medical history, getting records from her prior doctors, or trying alternative therapies.

In October 2014, Heaton prescribed H.J.W. cough syrup and 120 pills of Lortab 7.5 mg. Dr. Kaufman explained that these two drugs should never be prescribed together because they are dangerous and prone to abuse.

In March 2015, Heaton noted in H.J.W.'s file that "[t]he Lortab is down to seven a day." Dr. Kaufman testified that he was unsure how H.J.W.'s prescription "got to that level" since Heaton had not properly documented what prescriptions he gave to H.J.W. in her patient file.

At this point, Dr. Kaufman testified that it was "fair to say" that Heaton suspected H.J.W. had developed an addiction to her medication. Dr. Kaufman testified that Heaton: (1) properly told H.J.W. she should either reduce her dosage or enter drug

rehabilitation; and (2) began to decrease H.J.W.'s medication from seven pills of Lortab 10 mg per day in March 2015 to five pills of Lortab 10 mg per day in April 2015.

Then, in May 2015, Heaton prescribed H.J.W. 120 pills of oxycodone 15 mg, which increased her morphine equivalent from 50 to 90 MME for "no clear-cut reason." While Dr. Kaufman agreed that H.J.W.'s diseases might have justified the medication in a different setting, it was dangerous and medically inappropriate for Heaton to sharply increase her prescription when Heaton believed that she was abusing her medication.

### E.    Rule 29 Motion, Defense, and Verdict

At the close of the government's evidence, Heaton moved for judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied.

Heaton's defense was that he was only a "bad note-taker," and not a "drug dealer." Heaton did not testify, but he did call two witnesses: (1) Shane Mobley, who testified to Heaton's practices and policies at his sleep clinic; and (2) Dr. Alan Sanders, who testified to his own family practice in Blairsville, Georgia.

On cross-examination, Dr. Sanders testified that, when prescribing pain medications, he documents "everything [he] do[es]" with pain patients and takes "elaborate notes" about his appointment with pain patients in compliance with the Medical Board's requirements. Dr. Sanders explained that the State of Georgia made it "pretty easy" for physicians to prescribe controlled

substances and that physicians could "be safe" in prescribing controlled substances in compliance with the Medical Board's rules.

Michael Gowder testified in his own defense that, despite some compliance issues, the sleep clinic became profitable the year after the Hospital purchased it from Heaton. At the close of evidence, Heaton renewed his Rule 29 motion, which the district court denied as to Counts 2-130 and reserved ruling as to Count 1.

In closing argument, Heaton's counsel argued that Gowder, T.G., and H.J.W. all suffered from pain and that Heaton prescribed them pain medications for a legitimate medical purpose and within the scope of professional practice.

The jury convicted Heaton on the substantive § 841(a) and § 843 Counts 2-130 and acquitted him on the conspiracy Count 1. The district court sentenced Heaton to 72 months' imprisonment on his § 841(a) convictions in Counts 2-76 (Gowder) and his § 841(a) convictions in Counts 104-130 (T.G. and H.B.W.), to run concurrently, and concurrent 42-month sentences on his § 843 aiding and abetting convictions in Counts 77-103 (Gowder).

### III.    JURY INSTRUCTIONS

Heaton challenges the district court's jury instructions. We set forth the instructions and then Heaton's claims.

## A.    The District Court's Jury Instructions

The district court charged the jury that Heaton could be found guilty of his § 841(a) crimes only if all of these facts were proved beyond a reasonable doubt:

> (1) Dr. Heaton knowingly and intentionally dispensed oxycodone or hydrocodone; and
>
> (2) Dr. Heaton's dispensing of the oxycodone and/or the hydrocodone was outside the usual course of professional practice or for no legitimate medical purpose.

Heaton does not dispute that he knowingly and intentionally dispensed oxycodone and hydrocodone. At trial Heaton contended (1) his dispensing was not "outside the usual course of professional practice" and (2) his prescriptions were issued for a "legitimate medical purpose."

The district court charged the jury that whether Heaton dispensed the controlled substances "outside the usual course of professional practice": (1) is to be determined by the jury "based on the totality of the evidence presented concerning the accepted standard of professional practice in the State of Georgia at the time of the crime" and (2) is "to be judged objectively." (Emphasis added).

The district court further charged that "Heaton's good faith belief that he dispensed a controlled substance in the usual course of professional practice is not a defense to the charge if he dispensed

the controlled substances 'outside the usual course of professional practice.'"

The district court also instructed that, "[w]hether Dr. Heaton dispensed the controlled substances 'for no legitimate medical purpose' does depend on his subjective belief." (Emphasis added).

We now turn to Heaton's challenges to the jury charges.

## B.    Instructions as to the Elements of a § 841(a) Offense

Heaton argues that the district court erred because its jury instruction used "or," instead of "and," in setting forth the elements of a § 841(a) offense. Heaton contends that § 841(a) requires the government to prove that he prescribed medication both "outside the course of professional practice" *and* "for no legitimate medical purpose."[13]

Some background about § 841(a) is helpful. The Controlled Substances Act ("CSA") makes it unlawful, "[e]xcept as authorized[,] . . . for any person knowingly or intentionally . . . to manufacture, distribute, or dispense . . . a controlled substance," such as opioids. 21 U.S.C. § 841(a)(1) (emphasis added). In turn, the CSA expressly authorizes medical "practitioner[s]" to dispense Schedule II and Schedule III substances with a "prescription." *Id.*

---

[13] We review de novo whether a challenged jury instruction misstated the law. *United States v. Melgen*, 967 F.3d 1250, 1259 (11th Cir. 2020).

§ 829(b).[14]    Practitioners who seek to dispense controlled substances must register with the Attorney General.  *Id.* § 822(a)(2). The key statutory terms—"controlled substance," "dispense," "distribute," "practitioner," and "prescription"—are defined either by statute, *see id.* § 802(6), (10), (11), (21), or by regulation, *see* 21 C.F.R. § 1306.04(a) (2022).

The CSA's regulations, promulgated by the Attorney General, specify that, "[a] prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  21 C.F.R. § 1306.04(a).  As provided by regulation, a prescription is only authorized when a doctor issues it "for a legitimate medical purpose . . . acting in the usual course of his professional practice." *Id.*

In *United States v. Abovyan*, this Court concluded that a doctor violates § 841(a) if he prescribes controlled substances either (1) for no legitimate medical purpose <u>or</u> (2) outside the usual course of professional practice.  988 F.3d 1288, 1308 (11th Cir. 2021).    In *Abovyan*, the defendant physician requested an instruction stating, *inter alia*, that the government must prove

---

[14] Oxycodone and methadone are Schedule II controlled substances. 21 C.F.R. § 1308.12(b)(l)(xi), (c)(15).  Hydrocodone was reclassified from a Schedule III controlled substance to a Schedule II controlled substance, effective October 6, 2014.    *Id.* § 1308.12(b)(l)(vi); Schedules of Controlled Substances: Rescheduling of Hydrocodone Combination Products from Schedule III to Schedule II, 79 FR 49661-01 (Aug. 22, 2014).

beyond a reasonable doubt that the defendant was acting as a drug dealer, not a doctor. *Id.* This Court held that the district court did not abuse its discretion in refusing to give this instruction because "the law requires only that the jury find the doctor prescribed a drug [(1)] not for a legitimate medical purpose *or* [(2)] not in the usual course of professional practice." *Id.* (emphasis added and quotation marks omitted).

Similarly, in *United States v. Tobin*, this Court recognized that "a distribution [of prescription drugs] is unlawful if 1) the prescription was not for a legitimate medical purpose *or* 2) the prescription was not made in the usual course of professional practice." 676 F.3d 1264, 1282 (11th Cir. 2012) (quotation marks omitted), *abrogated on other grounds by United States v. Davila*, 569 U.S. 597, 133 S. Ct. 2139 (2013).

As the government points out, the plain language of 21 C.F.R. § 1306.04(a) demonstrates that the jury instruction here correctly used "or" in defining the elements of a § 841(a) offense. Under § 1306.04(a), a prescription for a controlled substance is *effective* if it is issued "<u>for a legitimate medical purpose</u> by an individual practitioner acting <u>in the usual course of his professional practice</u>." 21 C.F.R. § 1306.04(a) (emphases added). Put simply, the regulation has two requirements for a prescription to be effective: (1) "a legitimate medical purpose" . . . (2) by a practitioner "acting in the usual course of his professional practice." *Id.* Conversely, a prescription for controlled substances is *unlawful* if it is issued (1) without a legitimate medical purpose *or* (2) by the

physician acting outside the usual course of professional practice. *See id.* Thus, both requirements must be satisfied to make a prescription authorized.

For all of these reasons, we reject Heaton's challenge to the "or" portion of the jury charge. *Aboyvan*, 988 F.3d at 1308; *see also Tobin*, 676 F.3d at 1282.

## C.    Instructions as to § 841(a)'s Mens Rea Requirement

Next, Heaton argues that the jury instructions as to the mens rea requirement ran afoul of the Supreme Court's recent decision in *Ruan v. United States*, 597 U.S. ----, 142 S. Ct. 2370 (2022) ("*Ruan*"). Heaton argues that the district court erred in instructing the jury to apply an objective standard to the "outside the usual course of professional practice" requirement.[15] We first discuss the Supreme Court's *Ruan* decision and how *Ruan* error did occur here

---

[15] We reject the government's contention that we should not consider Heaton's *Ruan* argument in his direct appeal because he failed to file a timely motion under *United States v. Durham*, 795 F.3d 1329, 1330 (11th Cir. 2015) (en banc) (holding that an appellant may raise a new issue based on an intervening Supreme Court decision that overrules binding precedent). This contention ignores that: (1) oral argument in Heaton's direct appeal was set for December 2021, (2) Heaton timely suggested *Ruan* would affect his direct appeal by filing a motion to continue oral argument after the Supreme Court granted certiorari in *Ruan*, and (3) this Court continued Heaton's case to await the Supreme Court's decision in *Ruan*. After *Ruan* was decided in 2022, this Court ordered supplemental briefing. Under these particular circumstances, we are not persuaded by the government's claim.

as to the mens rea requirement.  We then evaluate whether it was harmless.

### 1.  *Ruan* Error

In *Ruan*, the defendant physicians were convicted of violating § 841(a)(1) by "dispensing controlled substances not 'as authorized.'"  597 U.S. at ----, 142 S. Ct. at 2375.  One of the defendants requested a jury instruction "requir[ing] the government to prove that *he subjectively knew* that his prescriptions fell outside the scope of his prescribing authority."  *Id.* at ----, 142 S. Ct. at 2375.  The district court rejected that instruction, and this Court affirmed.  *Id.* at ----, 142 S. Ct. at 2376.

Reversing, the Supreme Court held that the § 841(a) statute's "knowingly or intentionally" mens rea applied to the statute's "except as authorized" clause.  *Id.* at ----, 142 S. Ct. at 2376.  The Supreme Court instructed that: "After a defendant produces evidence that he or she was authorized to dispense controlled substances, the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so."  *Id.* at ----, 142 S. Ct. at 2375.

In *Ruan*, the Supreme Court reasoned that: (1) it is generally presumed that "Congress intends to require a defendant to possess a culpable mental state"; (2) a scienter requirement in a statute (like § 841(a)'s "knowingly or intentionally" language) typically modifies the statutory term "that separate[s] wrongful from

innocent acts"; (3) the statutory clause in question—"outside the usual course of professional practice"—plays a critical role in separating a defendant's wrongful from innocent conduct; and (4) § 841(a)'s scienter requirement applies to that critical statutory clause. *Id.* at ----, 142 S. Ct. at 2377–78 (quotation marks omitted). The Supreme Court further emphasized that the terms here are not the kind it has held fall outside the scope of scienter requirements. *Id.* at ----, 142 S. Ct. at 2378. The Supreme Court also noted that "[t]he Government . . . can prove knowledge of a lack of authorization through circumstantial evidence." *Id.* at ----, 142 S. Ct. at 2382. The Supreme Court declined to address whether any error in the jury instructions was harmless. *Id.* at ----, 142 S. Ct. at 2382.

Here similarly, the jury was instructed that "[w]hether Dr. Heaton dispensed the controlled substances 'outside the usual course of professional practice' is to be judged objectively."[16] Because this instruction allowed the jury to convict Heaton without considering whether he knowingly or intentionally issued

---

[16] To the extent Heaton challenges the jury instruction as to the mens rea for dispensing controlled substances for a legitimate medical purpose, that argument lacks merit. The jury was properly instructed that whether Heaton prescribed controlled substances for a legitimate medical purpose "depend[ed] on his subjective belief." There was no *Ruan* error as to the legitimate medical purpose part of the charge.

20-12568            Opinion of the Court            33

prescriptions outside the usual course of professional practice, it was erroneous under *Ruan*.[17]

### 2. Harmless Error

This brings us to whether the *Ruan* error—as to "outside the usual course of professional practice"—was harmless.

Jury instructions are subject to harmless error review. *United States v. Seabrooks*, 839 F.3d 1326, 1332 (11th Cir. 2016). The government, however, has the burden to prove harmless error. *See Neder v. United States*, 527 U.S. 1, 15, 119 S. Ct. 1827, 1837 (1999).

"An error is harmless if the reviewing court is satisfied beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Seabrooks*, 839 F.3d at 1332–33 (quotation marks omitted). Stated another way: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" *Neder*, 527 U.S. at 18, 119

---

[17] In *Abovyan*, there was no mens rea challenge to the jury instructions and thus no *Ruan* error. *Abovyan*'s holding—that a doctor violates § 841(a) if the "legitimate medical purpose" or "outside the scope of professional practice" requirement is met—remains binding precedent, which is why we follow *Abovyan* earlier. *See United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (explaining that "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*," but "the Supreme Court decision must be clearly on point" (quotation marks omitted)). Further, even without *Abovyan*, we explained earlier why the § 1306.04(a) regulation has two requirements.

S. Ct. at 1838; *see also Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436 (1986) ("[A]n otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

As noted earlier, the district court did charge that the government must prove beyond a reasonable doubt that Heaton subjectively knew he was dispensing pain medication for no legitimate medical purpose. But there was no special verdict form here, and the district court properly charged "or" as to "outside the usual course of a professional practice." Thus, we must assume that the jury verdict could have been based on Heaton's dispensing outside the usual course of professional practice "judged objectively."[18]

Nevertheless, we readily conclude that the government presented overwhelming evidence that Heaton subjectively <u>knew</u>

---

[18] Here, the district court suggested that a special verdict form be submitted to the jury on the two requirements, but Heaton declined. We note, as a general matter, that the use of a special verdict form is often a good practice. In a special verdict form, the jury can specify whether the defendant's prescriptions were issued for no legitimate medical purpose, outside the usual course of professional practice, or both. Therefore, we can more readily determine the basis for the jury verdict.

his conduct fell outside the usual course of his professional practice.[19] We recount the many ways that Heaton knew that.

The Medical Board's rules for prescribing controlled substances are well established and not disputed. For starters, Dr. Kaufman testified that the Medical Board had adopted "commonsense" rules that all physicians must follow, and Dr. Sanders, a defense witness, testified that it was "pretty easy" to prescribe controlled substances and that physicians could "be safe" in prescribing controlled substances in compliance with the Medical Board's rules. As Dr. Kaufman testified, those Medical Board rules for prescribing the pain medications here require physicians, like Heaton, to: (1) obtain a patient's prior medical history as to pain; (2) conduct a physical examination; (3) monitor a patient's compliance with use of the controlled substances by randomly checking bodily fluids (i.e., urine screens) four times a year; (4) document all prescriptions issued; (5) receive informed consent; (6) create a treatment plan; (7) refrain from sexual relationships with patients; (8) refrain from prescribing to known or suspected drug abusers; (9) obtain a treatment agreement with a patient if the patient is prescribed hydrocodone, oxycodone, or

---

[19] The government contends that Heaton's challenge to the mens rea used in the district court's jury instructions is, at most, reviewable for plain error because at trial he did not raise a timely objection to this jury instruction about "outside the usual course of professional practice." We assume—without deciding—that Heaton properly preserved this *Ruan* issue for appeal given that any error in the jury instruction was harmless.

similar substances for longer than ninety days; and (10) maintain appropriate records for patients receiving controlled substances.

After reviewing Heaton's patient files, Dr. Kaufman testified how Heaton regularly failed to comply with the Medical Board's rules. According to Dr. Kaufman, Heaton regularly: (1) failed to obtain prior medical records relating to pain complaints; (2) did not conduct credible physical examinations; (3) did not monitor patient compliance with prescribed medications; and (4) did not properly document the prescriptions that he issued to these patients. Heaton's own files prove he knew he was not following the Medical Board's rules. Here's just some of the many examples shown in the files.

As to Michael Gowder, Heaton repeatedly violated the Medical Board's requirement to "document everything." Even though Heaton began to prescribe Gowder pain medications in January 2012, he did not note in Gowder's patient file that he was prescribing Gowder pain medication until June 2012. As Dr. Kaufman testified and the PDMP records show, Heaton documented only 5 of the more than 100 prescriptions he issued to Gowder.

Heaton did not document in Gowder's patient file that he: (1) obtained Gowder's medical history; (2) conducted a physical examination; or (3) monitored compliance with Gowder's prescribed medications. Heaton's patient file for Gowder also did not contain prior records of Gowder's pain complaints or indicate that Heaton attempted to get those records. After the Medical

Board subpoenaed this file, Heaton supplemented the file with Gowder's MRI and radiology reports, indicating that Heaton was aware that his patient file for Gowder was incomplete.

Further, Heaton continued to prescribe Gowder pain medications despite clear signs that Gowder was abusing his medication. By May 2013, Heaton was prescribing Gowder such a high daily dose that Dr. Kaufman would have suspected that Gowder was a drug addict or was diverting his medication. Yet, Heaton continued to increase the potency of Gowder's pain medications and routinely provided Gowder with "extra" or early prescriptions for pain pills roughly every two weeks. By mid-2014, Heaton was prescribing Gowder a "very high" daily dose that would kill the average person, but an addicted person might be able to consume.[20]

As for T.G., the government's evidence proved that Heaton's prescribing practices went "way beyond poor recordkeeping," including evidence of a prohibited sexual relationship with a patient. Heaton knew his sexual relationship with T.G. fell outside the usual course of professional practice because the Medical Board had already warned him that such a relationship was prohibited. In July 2014, the Medical Board issued

---

[20] Although Heaton purportedly issued this pain medication to treat Gowder's back pain, Gowder reported only moderate back pain and numbness to other providers. Dr. Kaufman explained that this amount of pain would not have warranted the pain medications that Heaton prescribed to Gowder.

Heaton a letter of concern regarding its "boundary with patients" rule, which prohibits physicians from having sexual relationships with their patients. Months later, Heaton began to write T.G. the prescriptions charged in Counts 104-115, which were issued from October 15, 2014, to September 11, 2015—all while he was having a sexual relationship with T.G. Accordingly, Heaton's sexual relationship with T.G., despite receiving a warning from the Medical Board, proved that Heaton knew his prescriptions to T.G. fell outside the usual course of professional practice.

In addition, Heaton continued to increase the potency of T.G.'s pain medications without documenting T.G.'s response to the medication or conducting a full physical examination. As Dr. Kaufman testified, Heaton increased T.G.'s prescription to 90 pills of methadone 10 mg in July 2011 "for no apparent reason except that she went to New Jersey and it was cheaper."

Heaton ignored obvious red flags that T.G. was abusing her medication. Before T.G. became Heaton's patient, she informed Heaton that she had abused heroin. However, after T.G. was arrested for three DUIs and spent time in jail, Heaton continued to prescribe 150 pills of methadone 10 mg to her, even though T.G. told him that she spent four months in jail for her third DUI. Heaton did not even warn T.G. that it was dangerous to consume alcohol while taking her pain medication.

Turning to H.J.W., Heaton prescribed pain medications to her in flagrant violation of the Medical Board's rules. During H.J.W.'s first appointment, Heaton prescribed 60 pills of Lortab 7.5

mg to her, without obtaining an adequate medical history, getting her prior medical records, or trying alternative therapies. In March 2015, Heaton noted in H.J.W.'s file that "[t]he Lortab is down to seven a day," but Dr. Kaufman was unsure how H.J.W.'s prescription "got to that level" because Heaton had not properly documented H.J.W.'s prescriptions in her patient file.

Just two months later, in May 2015, Heaton sharply increased the strength of H.J.W.'s prescription just two months after H.J.W. told Heaton that she was buying pills from other people. Dr. Kaufman explained that it was dangerous and medically inappropriate for Heaton to increase H.J.W.'s prescription when Heaton believed that she was abusing her medication.

Finally, Heaton's own interactions with the Medical Board confirm Heaton subjectively knew he was not prescribing pursuant to professional practices. Although Heaton informed the Medical Board that he obtained patient contracts from every pain patient, his files for Michael Gowder, T.G., and H.J.W. did not contain these contracts. In fact, Heaton's records did not contain any patient agreements with Gowder or T.G. As for H.J.W., Heaton asked her to sign a handwritten agreement, which stated that H.J.W. would only get her pain medications from Heaton, who would "titrate down" her pain medication. Heaton violated his own handwritten agreement when he increased H.J.W.'s prescription just two months later.

Heaton failed to take any action after T.G. and H.J.W. violated the terms of the pain contracts that he provided to the Medical Board. Heaton filled T.G.'s prescription early without documenting a "real reason" after T.G. asked him to replace a prescription. Heaton also prescribed 60 pills of Lortab 7.5 mg to H.J.W. upon her request and increased her dosage of pain medications twice after she asked him to do so. Heaton's failure to act when he knew these patients had violated the terms of his own patient pain agreements showed that Heaton knew the prescriptions to these patients were issued outside the usual course of professional practice.

In short, we are satisfied that (1) this evidence extensively proved beyond a reasonable doubt that Heaton subjectively knew his prescriptions to Michael Gowder, T.G., and H.J.W. were issued outside the usual course of professional practice, and (2) a jury would have found Heaton guilty absent the error.[21] There is no

---

[21] Heaton also argues that the evidence at trial was insufficient to show that the prescriptions he issued to Michael Gowder, T.G., and H.J.W. had no legitimate medical purpose. We review de novo whether the evidence is sufficient to support a conviction, taking all evidence and drawing all reasonable inferences in the light most favorable to the government. *Abovyan*, 988 F.3d at 1302.

Based on the evidence discussed throughout this opinion, we conclude that the trial evidence amply showed Heaton's prescriptions in Counts 2-76 and 104-130 were issued for no legitimate medical purpose.

basis in this trial record for concluding that the jury would have acquitted Heaton had it been properly instructed.

### 3. *Ruan II*

Before concluding, we recognize that this Court concluded on remand from the Supreme Court's decision in *Ruan* that: (1) the jury instructions "inadequately conveyed the required mens rea to authorize conviction under § 841(a)"; and (2) the error in that case was not harmless. *United States v. Ruan*, 56 F.4th 1291, 1298 (11th Cir. 2023) ("*Ruan II*"). The trial evidence in *Ruan II*, however, was nothing like the evidence in Heaton's case.

On remand, this Court observed that: (1) both defendants presented expert evidence about the appropriate standard of care; (2) Dr. Ruan "introduced witnesses who testified to his practices and procedures at the clinic to guard against abuse"; (3) Dr. Ruan testified in his own defense "about how he always centered the patient's medical needs;" (4) Dr. Couch introduced "lay witnesses who testified to his activities at the clinic"; (5) Dr. Couch "testified to his activities at the clinic"; and (6) both Dr. Ruan and Dr. Couch testified that they believed their actions were in accord with the applicable standard of care. *Id.* Even if the jury in *Ruan II* believed the doctor defendants' testimony about their beliefs, our Court pointed out that the jury could still have convicted them "if [the jury] found that a reasonable doctor would not have believed the conduct was in accord with the appropriate standard." *Id.* We reasoned that "a properly instructed jury may not have convicted the defendants had it known that Dr. Ruan's and Dr. Couch's

subjective beliefs that they were acting properly was a defense to these charges." *Id.*

This case is materially different than *Ruan II.* Unlike the physicians in *Ruan II*, Heaton did not testify in his own defense, nor did Heaton call any expert witnesses to testify that his practices complied with professional practices. Even though Heaton called two lay witnesses (Mobley and Dr. Sanders), neither witness testified about Heaton's activities at his clinic—much less that they complied with professional practices. Of course, neither testified that Heaton, or any doctor for that matter, could reasonably believe Heaton's practice complied.[22] In light of all the overwhelming evidence of Heaton's subjective knowledge recounted above, we are well satisfied that the jury would have convicted Heaton had it been properly instructed.

## IV.    VAGUENESS

Heaton also argues that § 841 is unconstitutionally vague as applied to him. He contends that the phrase "in the usual course of his professional practice" lacks a standard defining when a physician's prescribing practices become unlawful.[23]

___

[22] Gowder did testify in his own defense about his interactions with Heaton. After Heaton's defense rested, Gowder (1) testified that he "didn't have a clue" what Heaton put in his charts, and (2) gave no testimony about the usual course of professional practices for doctors or Heaton's subjective belief.

[23] We review de novo whether a criminal statute is unconstitutionally vague. *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010).

20-12568            Opinion of the Court            43

Where a vagueness challenge does not involve the First Amendment, our Court must determine whether the statute at issue, as applied to the facts of the case, "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or it authorizes or even encourages arbitrary and discriminatory enforcement." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2010) (quotation marks omitted). A criminal statute is not required to "define every factual situation that may arise." *United States v. Biro*, 143 F.3d 1421, 1430 (11th Cir. 1998). There is a "strong presumption that statutes passed by Congress are valid." *Wayerski*, 624 F.3d at 1347.

In *United States v. Collier*, this Court held that § 841(a) is not unconstitutionally vague as applied to physicians. 478 F.2d 268, 270–72 (5th Cir. 1973).[24]

In *Collier*, a physician appealed his § 841(a)(1) conviction for dispensing methadone while acting outside the usual course of professional practice. *Id.* at 270. Affirming the conviction, this Court rejected the physician's arguments (1) that the phrase "in the course of his professional practice" did not give physicians notice as to what conduct violates the statute, and (2) that "statutes affecting medical practice [must] delineate the precise

---

[24] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as precedent the decisions of the former Fifth Circuit handed down prior to October 1, 1981.

circumstances constituting the bounds of permissible practice." *Id.* at 270–72.

In so ruling, our Court concluded that § 841(a) is not unconstitutionally vague because it restricts a physician to "dispensing or prescribing drugs in the bona fide treatment of a patient's disease" and does not "under the guise of treatment" permit a physician to "distribute drugs to an addict." *Id.* at 272. Indeed, the phrase—"usual course of his professional practice"—gives physicians a certain latitude of available options. *Id.* at 270–72.

Here, Heaton raises essentially the same argument that our Court rejected in *Collier*—that the phrase "the usual course of his professional practice" lacks a standard defining when a physician's prescribing practices become unlawful. *See id.*

Heaton attempts to distinguish his case from *Collier* on the basis that *Collier* was decided before the relevant case law devolved into a "state of muddled confusion." He contends that existing case law provides insufficient guidance as to the applicable mens rea and standard of care for § 841(a) offenses involving physicians.

We are unpersuaded. Our Court has identified specific examples of "condemned behavior" by physicians that violates § 841(a), including (1) prescribing an excessive quantity of controlled substances; (2) issuing large numbers of such prescriptions; (3) failing to physically examine patients; (4) prescribing controlled drugs at intervals inconsistent with

legitimate medical treatment; and (5) issuing prescriptions for drugs that had no logical relationship to the treatment of the patient's alleged condition. *See United States v. Rosen*, 582 F.2d 1032, 1035–36 (5th Cir. 1978); *see also United States v. Joseph*, 709 F.3d 1082, 1104 (11th Cir. 2013) (affirming physician's § 841(a) conviction where evidence showed he prescribed an inordinate amount of controlled substances, he conducted inadequate physical examinations, and many of the combinations of prescribed drugs were not medically necessary), *overruled on other grounds by Ruan*, 597 U.S. ----, 142 S. Ct. 2370; *Abovyan*, 988 F.3d at 1305 (affirming physician's § 841(a) conviction where evidence showed he prescribed controlled substances for pain/withdrawal when patients did not have pain/withdrawal and he failed to conduct adequate physical examinations).

Tellingly too, the Supreme Court's *Ruan* decision clarified the mens rea that should be incorporated into jury instructions for § 841(a) offenses. 597 U.S. at ----, 142 S. Ct. at 2376. The Supreme Court determined that (1) § 841(a)'s "knowingly or intentionally" mens rea applies to the critical terms in the statute and (2) the government must prove that the defendant physician subjectively knew that his conduct fell outside the usual course of professional conduct. *Id.* at ----, 142 S. Ct. at 2376. We have no reason to depart from our precedent in *Collier*.

Likewise, we reject Heaton's argument that § 841 is unconstitutionally vague because the CSA does not define the phrases "legitimate medical purpose" and "usual course of

professional practice."  These phrases do not require statutory or regulatory definitions.    Rather, they are phrases reasonably understandable by a physician and their factual application will necessarily entail a case-by-case analysis. *See Collier*, 478 F.2d at 270–72; *Biro*, 143 F.3d at 1430.  For the above reasons, we conclude § 841(a) is not unconstitutionally vague as applied to physicians.

## V.    CONCLUSION

We affirm Heaton's convictions.[25]

**AFFIRMED.**

---

[25] Heaton does not appeal his 72-month sentence.