[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13973

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KENDRICK EUGENE DULDULAO,
MEDARDO QUEG SANTOS,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:17-cr-00420-MSS-AEP-4

_____

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

JILL PRYOR, Circuit Judge:

This multidefendant criminal appeal is before us on remand from the Supreme Court of the United States. After we affirmed the convictions of Kendrick Eugene Duldulao and Medardo Queg Santos for the roles they played in a Florida "pill mill," the Supreme Court vacated our judgment and remanded for further consideration in light of *Ruan v. United States*, 142 S. Ct. 2370 (2022) ("*Ruan II*"). *See United States v. Duldulao*, No. 20-13973, 2021 WL 6071511 (11th Cir. Dec. 21, 2021) (unpublished), *vacated sub nom. Santos v. United States*, 143 S. Ct. 350 (2022). With the benefit of the Supreme Court's guidance, supplemental briefing, and oral argument, we now affirm in part, vacate in part, and remand in part for a new trial.

## I. BACKGROUND

This appeal concerns the criminal convictions of two doctors, Duldulao and Santos, who participated in a "pill mill"—a pain management clinic that does not follow medical standards because its purpose is to prescribe controlled substances regardless of whether its patients have a medical need for them. *See United States v. Azmat*, 805 F.3d 1018, 1025 n.1 (11th Cir. 2015). Duldulao and Santos served sequentially as Medical Directors of a pain management clinic in Tampa, Florida called Health and Pain Clinic ("HPC"). HPC liberally dispensed controlled substances to its patients, who paid with cash or credit, exhibited obvious signs of drug addiction, and received little attention from doctors. A jury

convicted both Duldulao and Santos of conspiracy to distribute and dispense controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, violating 21 U.S.C. § 846. The jury also convicted Santos of multiple substantive counts of distributing controlled substances not for a legitimate medical purpose and outside the usual course of professional practice, violating 21 U.S.C. § 841.

Duldalao and Santos became involved with HPC in 2011 and 2014, respectively, when Ernest Gonzalez, the de facto owner of HPC, hired them to work at his pill mill. Gonzalez knew that the patients "were coming in [] to get controlled substances," so, at Duldulao's and Santos's respective job interviews, Gonzalez made it clear that HPC's patients expected to receive controlled substances during their visits. Doc. 382 at 38.[1] Gonzalez confirmed that Duldalao knew the clinic "need[ed] a doctor who was going to do controlled substances" and discussed specific controlled substances that Duldulao would use to treat the clinic's patients. Doc. 382 at 36. Gonzalez also told Duldulao and Santos about key aspects of the business model: very short, timed patient appointments; high patient volume (30–40 patients per day); and up-front payment only—HPC did not accept insurance.

Other characteristics suggested that the clinic was not a legitimate medical operation. The clinic had barely any medical equipment—only an exam table for the patients to sit on—or

---

[1] "Doc." refers to the district court's docket entries.

supplies. HPC staff who ran the front desk and did patient intake had no medical or administrative training. Yet they wrote prescriptions for controlled substances for the doctor to sign after each patient's brief visit.

HPC's patients exhibited obvious signs of substance abuse. Witnesses described them as having bloodshot eyes, slurring their words, looking sleepy, and stumbling when they walked. Some patients had visible track marks, indicating intravenous drug abuse. Others looked like they were going through opiate withdrawal—sweating, shaking, vomiting, and experiencing hot and cold flashes. People were "nodding out" in the waiting room and "shooting up" in the parking lot. Doc. 384 at 100; Doc. 387 at 42. Patients hung out in the parking lot and left behind trash like baggies, blunt wrappers, and syringes.

The clinic administered drug tests, but patients sometimes bribed HPC staff to skip the drug test. The staff falsified test records after letting patients skip the test. When patients who actually took drug tests tested positive for illegal drugs, HPC staff would sometimes mark a negative result in their file and allow the patients to receive prescriptions anyway.

It was easy to get controlled substances at HPC: according to witnesses, HPC patients always left with new prescriptions for controlled substances. To obtain prescription medication, HPC patients needed little documentation of a condition that required pain management—just an MRI within the last two years documenting a physical abnormality of some kind. That and a Florida driver's

license got the patients prescriptions for controlled substances like oxycodone and methadone.

Duldalao and Santos participated in these practices. During patient appointments, Duldulao conducted cursory medical examinations. Sometimes he spent up to five minutes on the physical exam; sometimes he simply did not perform one. He spent little time on patient medical history. When he went on vacation, his patients picked up prewritten, postdated prescriptions without any medical exam at all. He wrote prescriptions for controlled substances for patients even when they bore visible track marks or had traveled from long distances—both red flags for controlled substance abuse, according to the government's medical expert witness, Dr. Kevin Chaitoff. Duldulao prescribed controlled substances in dangerous combinations, allowing his patients to mix Xanax, methadone, and a muscle relaxer called Soma. He even admitted to his girlfriend that he worked at a "pain mill." Doc. 386 at 143.

When Santos replaced Duldulao as HPC's Medical Director, little changed at HPC. Like Duldulao, Santos prescribed controlled substances to people who looked like drug abusers. He saw them in brief appointments, timed by HPC staff. It did not matter if his patient's medical history or drug test was missing. It did not matter if a patient told him she shared her pills with friends or family. He prescribed patients controlled substances nonetheless. He prescribed drugs in the same dangerous combinations that Duldulao

had. Santos, too, went on vacations and left prewritten, postdated prescriptions for his patients.

Unbeknownst to Santos, however, two of his patients were government agents: undercover DEA task force member Kathy Chin and her "boyfriend," a confidential informant named Robert Vasilas. Over the course of a little over a year, Chin and Vasilas made a series of five visits to Santos that would later serve as the basis for three of Santos's convictions.

Chin (without Vasilas) made the first of these visits to HPC and Santos in July 2014. Chin presented as a new patient with no medical documentation and vague complaints of lower back pain lacking any obvious cause that over the counter medication would not alleviate. During a brief visit, Santos joked about DEA's "prohibition" on controlled substances resulting in the closure of many pain clinics. Doc. 372-208 at 4:30–5:10.[2] And Chin used slang ("30s" and "15s" of "Oxy") to describe quantities and types of controlled substances, suggesting a potential substance-abuse problem. *Id*. at 5:10–5:20. Nevertheless, after a cursory examination in which Santos discussed no alternative forms of treatment, Santos wrote Chin a prescription for hydrocodone, which Santos changed to a prescription for oxycodone a few days later. Chin told Santos that she would fill the prescriptions in Alabama.

---

[2] At trial, the government introduced videos of interactions between Santos and the agents. Our citations to Doc. 372 (the government's trial exhibit list) refer to these videos by their exhibit numbers.

Santos saw Chin again a few months later. During her visit to HPC, Chin asked Santos for more controlled substances and told him that she had run out of oxycodone because—although she experienced no increase in pain—she had been "doubling," taking more than the prescribed amount. Doc. 372-212 at 11:00–12:15. Santos agreed to provide 10 extra pills. Chin also asked if Santos could provide her medication through a smaller number of pills at a higher dosage (30 mg) When Santos expressed surprise that Chin could get high-dose oxycodone, Chin explained that she and her boyfriend both received controlled substances from pain clinics by driving two hours round trip to Alabama, where pharmacies required less stringent documentation to dispense large amounts of controlled substances. Chin said she was already receiving 30 mg pills there, implying she had multiple sources of controlled substances. *Id*. at 0:42–0:44 ("In Alabama I'm gettin' em."). And Chin revealed that she lived in Panama City, meaning she travelled almost 400 miles to HPC's Tampa location. Nevertheless, Santos wrote Chin a prescription that increased the total amount of controlled substances she received and gave her access to higher-dose pills.

At Chin's next visit, Vasilas came with her. Vasilas, a returning patient, told Santos that Chin was "robbing" him of his pills when she ran out of hers. Doc. 386 at 173. Instead of investigating this red flag, Santos gave both of them prescriptions for greater quantities of oxycodone. He also wrote Vasilas a new prescription for Xanax without asking Vasilas about his history with anxiety or what tools he used to manage it. He started Vasilas on Xanax, even

though most doctors would not have prescribed that drug to someone who was also taking an opioid. At no point did Santos discuss alternative treatments or milder medications with either patient.

Chin later made another visit to Santos without Vasilas. In an earlier visit, Santos had agreed to give Chin prescriptions to take to Vasilas, who said he would be out of town for work. Santos told Chin she would have to pay (cash, of course) for a visit for Vasilas, even though Vasilas would not be present. Santos gave her prescriptions for the absent Vasilas, even filling out Vasilas's file as though Santos had examined him.

In a final visit, Chin and Vasilas returned to see Santos together. Vasilas told Santos that he had run out of his pills and had been getting medications from friends and family. Santos responded by giving Vasilas extra prescriptions with a "do not fill until" date; Santos charged him for the prescriptions written in advance.

After collecting evidence (including videos) through these undercover visits, the government indicted Santos, Duldulao, and Gonzalez. Gonzalez pled guilty and testified against Santos and Duldulao. Based on their conduct at HPC, a second superseding indictment charged Duldulao and Santos each with one count of conspiracy to distribute and dispense oxycodone, hydromorphone, morphine, methadone, and hydrocodone (Schedule II controlled substances) and alprazolam (Xanax, a Schedule IV controlled substance), not for a legitimate medical purpose and not in the usual course of professional practice, violating 21 U.S.C. § 846. It also

charged both men with multiple substantive counts of distributing controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, violating 21 U.S.C. § 841. Santos faced five counts under § 841: one for each of the five visits made by Chin and Vasilas we have described.

At trial, the government established the facts surrounding Duldulao's and Santos's conduct through the testimony of Gonzalez, government agents, HPC patients, and HPC employees. The government also called Dr. Chaitoff as an expert in pain management treatment. Dr. Chaitoff testified about how he practices pain management, underscoring how it differs from the conduct of the doctors and staff of HPC. In his practice, Dr. Chaitoff conducts a comprehensive physical exam on patients; speaks with them about their medical history, their current pain, and the narcotics agreement patients are required by law to sign; and typically allots 30 to 35 minutes for an initial visit and 20 minutes for a follow-up—much longer than the appointments patients received with Duldulao or Santos. He testified that patients who are clearly abusing controlled substances should not be treated with more controlled substances, even if they have a legitimate pain problem.

Dr. Chaitoff also opined that "most of" the prescriptions that Santos wrote for controlled substances "were provided for no legitimate medical purpose, [and] they were not issued in the course of one's professional practice." Doc. 388 at 20. Santos moved to strike his testimony, but the district court denied the motion,

noting that Santos could cross-examine Dr. Chaitoff to challenge his credibility.

After the government rested its case, both Duldulao and Santos moved for a judgment of acquittal. At the trial's conclusion, the district court granted Duldulao's motion as to most of the substantive counts of dispensing and distributing controlled substances but otherwise denied the motions.

The jury convicted both Duldulao and Santos of the conspiracy count. It also convicted Santos of three substantive violations of 21 U.S.C. § 841 and acquitted him of two others.

Duldulao and Santos appealed on four grounds. Both men challenged the sufficiency of the evidence as to their conspiracy convictions under 21 U.S.C. § 846. Santos challenged the admission of Dr. Chaitoff's expert testimony about his treatment of patients. Santos also challenged the district court's denial of his motion to strike Dr. Chaitoff's testimony. Finally, Santos challenged the calculation of his sentence. We considered each ground and, with the benefit of oral argument, affirmed. *Duldulao*, 2021 WL 6071511.

After we affirmed, the Supreme Court addressed liability under 21 U.S.C. § 841 in *Ruan v. United States*, 142 S. Ct. 2370 (2022) ("*Ruan II*"). *Ruan II* overruled our precedent addressing the scienter requirement under that statute. *Id.* at 2382.

Title 21 § 841 makes it a federal crime "except as authorized, for any person knowingly or intentionally to manufacture, distribute, or dispense a controlled substance." *Id.* at 2374–75 (internal quotation marks omitted) (alterations adopted). Federal

regulations in turn authorize doctors to prescribe controlled sub-stances "for a legitimate medical purpose . . . in the usual course of . . . professional practice." 21 C.F.R. § 1306.04(a). Thus, a doctor vi-olates 21 U.S.C. § 841 when he distributes or dispenses a controlled substance either not for a legitimate medical purpose or outside the usual course of professional practice. *See United States v. Abovyan*, 988 F.3d 1288, 1305 (11th Cir. 2021) (holding that a violation of ei-ther prong is sufficient to violate § 841); *see also United States v. Hea-ton*, 59 F.4th 1226, 1241 n.17 (11th Cir. 2023) (concluding that this holding of *Abovyan* survived *Ruan II*).

Before *Ruan II*, our precedent required the government to show that a defendant subjectively knew he was acting not for a legitimate medical purpose under § 841. *United States v. Tobin*, 676 F.3d 1264, 1282 (11th Cir. 2012). But it did not require the same showing with respect to whether a doctor violated § 841 by pre-scribing a controlled substance outside the usual course of profes-sional practice. *Id.*; *see also United States v. Williams*, 445 F.3d 1302, 1309–10 (11th Cir. 2006); *United States v. Merrill*, 513 F.3d 1293, 1305–06 (11th Cir. 2008). Instead, our cases explained that, when it came to whether a physician acted outside the usual course of pro-fessional practice, "the appropriate focus is not on the subjective intent of the doctor" but rather on "whether, from an objective standpoint, the controlled substances were dispensed in the usual course of professional practice." *Tobin*, 676 F.3d at 1282 (internal quotation marks omitted) (alteration adopted).

*Ruan II* rejected that distinction. Overruling our decision in *United States v. Ruan*, 966 F.3d 1101 (11th Cir. 2020) ("*Ruan I*"), the Supreme Court held that the scienter provision of 21 U.S.C. § 841(a) ("knowingly or intentionally") applies to both prongs of the authorization exception. *Ruan II*, 142 S. Ct. at 2382. To establish criminal liability under § 841, it therefore is not enough for the government to prove that a defendant acted outside the usual course of professional practice by violating an objective standard of care. Rather, *Ruan II* requires the government to prove that "the defendant knowingly or intentionally acted in an unauthorized manner"—that the defendant knew he was acting outside the usual course of professional practice or intended to. *Id.* The Supreme Court criticized an objective standard, like the one we had applied, as reducing the requirements for criminal culpability under § 841 "to negligence." *Id.* at 2381.

After we affirmed Santos's conviction (and while *Ruan II* was pending before the Supreme Court), Santos petitioned for a writ of certiorari. Pet. for Writ of Cert., *Santos v. United* States, 143 S. Ct. 350 (2022) (No. 21-1418). Following its decision in *Ruan II*, the Supreme Court granted the petition, vacated our judgment, and remanded for further consideration in light of *Ruan II*. *Santos*, 143 S. Ct. at 350. This appeal is now before us again.[3]

---

[3] Although only Santos petitioned for certiorari, we permitted both parties to participate in this remand. After all, we entered a single judgment as to both Santos and Duldulao. And the Supreme Court vacated "[t]he judgment." Judgment, *Santos v. United States*, 143 S. Ct. 350 (No. 21-1418).

## II.    STANDARD OF REVIEW

"We review the sufficiency of the evidence *de novo* when, as here, the defendant[s] have preserved [their] claim[s] by moving for . . . judgment[s] of acquittal." *Azmat*, 805 F.3d at 1035.

In a criminal appeal, we review issues not raised at trial for plain error, which "occurs if (1) there was error, (2) that was plain, (3) that affected the defendant's substantial rights, and (4) that seriously affected the fairness, integrity, or public reputation of judicial proceedings." *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010) (internal quotation marks omitted); *see also* Fed. R. Crim. P. 52(b). An error is plain if it is "clear" or "obvious." *United States v. Olano*, 507 U.S. 725, 734 (1993). When "the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Chau*, 426 F.3d 1318, 1322 (11th Cir. 2005) (internal quotation marks omitted).

We review the district court's denial of a motion to strike testimony for an abuse of discretion. *United States v. Woody*, 567 F.2d 1353, 1357 (5th Cir. 1978).[4] We will reverse only if we find an error that affected the defendant's substantial rights. *See United States v. Barton*, 909 F.3d 1323, 1337 (11th Cir. 2018).

---

[4] Decisions of the Fifth Circuit issued before October 1, 1981 are binding precedent in this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

We review a district court's application of the Sentencing Guidelines *de novo*. *United States v. Johnson*, 980 F.3d 1364, 1374 (11th Cir. 2020).

## III.    DISCUSSION

On remand, Duldulao and Santos renew the challenges we addressed in our now-vacated opinion affirming their convictions and Santos's sentence. For the first time, on remand, they add that the jury was improperly instructed. According to Duldulao and Santos, the instructions the jury received regarding the § 846 conspiracy counts and the § 841 substantive counts failed to convey the mens rea *Ruan II* requires. We conclude that only the challenge to the § 841 jury instructions has merit. We therefore affirm Duldulao's conviction under § 846, affirm Santos's conviction under § 846, vacate Santos's convictions under § 841, and vacate Santos's sentence.

### A.    *§ 846 Jury Instructions*

The jury convicted both Duldulao and Santos of conspiracy to distribute and dispense controlled substances without authorization, violating 21 U.S.C. § 846. On remand, they challenge the propriety of the district court's jury instruction on conspiracy under *Ruan II*. The United States responds that we cannot reach the jury instruction because the defendants invited any error. *See United States v. Maradiaga*, 987 F.3d 1315, 1322–23 (11th Cir. 2021).

Invited or not, our decision on remand in *United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) ("*Ruan III*"), *cert. denied*, 2023 WL 7287134 (U.S. Nov. 6, 2023) (No. 22-1175), precludes us from

finding error in the district court's conspiracy instruction. In *Ruan III*, we reviewed *de novo* (and upheld) a district court's conspiracy instruction under 21 U.S.C. § 846. *Id.* at 1296, 1299. Although we found the jury instruction as to the substantive § 841 charge inconsistent with *Ruan II*, we nevertheless concluded that the conspiracy instruction "conveyed the adequate mens rea." *Id.* at 1299. We reached that conclusion because, despite any defect in the instruction as to the substantive counts, "the conspiracy instructions already required [the jury] to find that the defendant acted with subjective knowledge." *Id.* Those instructions required the jury to find that the defendants "agreed to try and accomplish a shared unlawful plan to distribute or dispense" controlled substances and that they "knew the unlawful purpose of the plan and willfully joined it." *Id.* The jury was further instructed that "a person acts with willfulness only when they act voluntarily and purposefully to do something the law forbids." *Id.* (internal quotation marks omitted) (alterations adopted). Based on these instructions, we concluded the jury could not have convicted the *Ruan* defendants if it thought they subjectively believed their actions fell within the professional practice of medicine. *Id.*

What was true of that conspiracy instruction is true of this one. The district court instructed the jury that the government was required to prove that:

> two or more persons in some way agreed to try to accomplish a shared and unlawful plan as charged in the second superseding indictment; and that the defendant knew the unlawful purpose of the plan and

> willfully joined in it; and that the object of the unlaw-
> ful plan was to distribute and dispense, and cause the
> distribution and dispensing of [controlled substances]
> for no legitimate medical purpose and outside the
> usual course of professional practice.

Doc. 392 at 179. The court further instructed that "willfully means
that the act was committed voluntarily and purposely, with the in-
tent to do something the law forbids." *Id*.at 183. Thus, the district
court instructed the jury that it could convict Duldulao and Santos
only if it found that they subjectively knew the object of the con-
spiracy was to distribute controlled substances without authoriza-
tion.

In their supplemental reply briefs—filed after *Ruan III*—
Santos and Duldulao do not argue that the conspiracy jury instruc-
tions here are distinguishable from those given in *Ruan III*. To the
contrary, Santos (whose brief Duldulao joined) states that "[t]he in-
structions in *Ruan* and this case aren't different in any material re-
spect." Santos Supp. Reply Br. at 6. Instead, they contend that *Ruan
III* either flunks our prior panel precedent rule or it should be re-
considered. As a panel of this Court, we have no authority to revisit
the holding of *Ruan III*. *See Scott v. United States*, 890 F.3d 1239,
1256–57 (11th Cir. 2018). And under our prior panel precedent rule,
*Ruan III* controls.

Our prior panel precedent rule compels us to obey the hold-
ing of "first [panel] in this Circuit to address [an] issue." *Smith v.
GTE Corp.*, 236 F.3d 1292, 1302 (11th Cir. 2001). That is so even if a

subsequent panel has reached a result contrary to the prior panel. *Id*. The rule governs "unless and until" the first panel's opinion "is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008). Duldulao and Santos point out that the Tenth Circuit—in a case consolidated with *Ruan II* before the Supreme Court—recently held that a faulty § 841 instruction "infected" each of the defendant's convictions, including the conspiracy conviction under § 846. *United States v. Kahn*, 58 F.4th 1308, 1311, 1321–22 (10th Cir. 2023). But the Tenth Circuit's decision in *Kahn* does not deny our prior precedent rule its force: "only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." *United States v. Brown*, 342 F.3d 1245, 1246 (11th Cir. 2003) (internal quotation marks omitted). In deciding this appeal, we must adhere to *Ruan III*.

Duldulao and Santos also try to direct us to *United States v. High*, 117 F.3d 464 (11th Cir. 1997), as the relevant prior panel precedent. Like this case, *High* was a criminal appeal involving a drug conspiracy. *Id*. at 465. But in *High*, the government alleged that the defendants conspired to launder drug proceeds (violating 18 U.S.C. § 1956), structure transactions to avoid regulatory scrutiny (violating 31 U.S.C. § 5324), and defraud the United States (violating 18 U.S.C. § 981). *Id*. at 469. Instead of charging the defendants with three separate conspiracy counts or seeking a special verdict identifying the basis for each conviction, the government sought and obtained a general conspiracy verdict against the defendants. *Id*. at 470. Because the district court wrongly instructed the jury on the

mens rea requirement for the underlying structuring offense and we could not determine which underlying offense was the basis for conviction, we concluded that we needed to reverse. *Id.*

*High*'s holding rested on our conclusion that the conspiracy instruction did not cure the erroneous instruction as to the conspiracy's object. *Id.* The conspiracy instruction, together with the structuring instruction, failed to convey the necessary mens rea for convicting the defendants of conspiracy to engage in structuring in violation of 31 U.S.C. § 5324. *See Ratzlaf v. United States*, 510 U.S. 135, 136–37 (1994). In contrast, in *Ruan III*, we decided that the conspiracy instruction adequately conveyed the required mens rea and was not erroneous, so *Ruan III* did not contradict *High*'s holding about how to proceed when instructional error does exist. *Ruan III*, 56 F.4th at 1299 (concluding that "the instructions for the drug conspiracy charges were not erroneous"). Nor would it be fair to say that *High*'s contextual analysis of one specific jury instruction required the *Ruan III* panel to conclude that a very different set of instructions also was error. *See United States v. Cochran*, 683 F.3d 1314, 1319 (11th Cir. 2012) (explaining that we "analyze the objected-to portion of [jury] instructions in light of the entire charge" (internal quotation marks omitted)). *Ruan III* does not conflict with *High*.[5]

---

5 Because we conclude *Ruan III* is the controlling prior panel precedent, we need not consider whether—as the government argues—intervening Supreme Court precedent has abrogated *High*'s remedial holding.

*Ruan III* controls and requires us to conclude that the instructions the jury received describing the elements of a conspiracy under § 846 were proper.

### B.        § 841 Jury Instructions

Besides one count of § 846 conspiracy, the jury convicted Santos of three counts of dispensing and distributing, and causing the distribution and dispensing of, controlled substances not for a legitimate medical purpose and not in the usual course of professional practice, in violation of 21 U.S.C. § 841. On remand, Santos challenges the district court's instructions to the jury on these counts as inconsistent with *Ruan II*. The government argues that any instructional error was "invited" and thus cannot support reversal. Because we agree with Santos that the jury instructions regarding § 841 amounted to plain error, we address the government's invited-error argument.

Under the doctrine of invited error, on appeal, "a party may not challenge as error a ruling or other trial proceeding invited by that party." *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1293–94 (11th Cir. 2002) (internal quotation marks omitted). Proposing the language of a jury instruction is "a textbook case of invited error" under our precedent. *Maradiaga*, 987 F.3d at 1322. As the government points out, the defense proposed at least some of the jury instruction to which it now objects. And, in an unpublished opinion, we have applied the invited error doctrine to a similar set of circumstances in a post-*Ruan II* case. *United States v. Mencia*, No. 18-

13967, 2022 WL 17336503, at *13 (11th Cir. Nov. 30, 2022) (un-published).

The doctrine of invited error applies when an error is "attributable to the action of the defense." *United States v. Jones*, 743 F.3d 826, 828 n.1 (11th Cir. 2014) (internal quotation marks omitted). It prevents litigants from sandbagging district courts by "introducing error at trial with the intention of creating grounds for reversal on appeal." *United States v. Stone*, 139 F.3d 822, 839 (11th Cir. 1998). And it enforces the notion, rooted in fairness, that "someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1213 (11th Cir. 2011).

Considering the doctrine's purposes, our sister circuits recognize an exception where the "error" invited by a party "relied on settled law that changed while the case was on appeal." *United States v. Titties*, 852 F.3d 1257, 1264 n.5 (10th Cir. 2017); *see also United States v. Andrews*, 681 F.3d 509, 517 n.4 (3d Cir. 2012). We join them in recognizing this exception and conclude that it applies in the harsh circumstances of this case.

According to the government, Santos should have proposed jury instructions that were inconsistent with then-binding and longstanding circuit precedent holding that whether a physician acts in the usual course of professional practice is judged objectively. Before *Ruan II*, we reiterated that holding many times in published opinions dating back at least to 2006. *Tobin*, 676 F.3d at 1282–

83; *Merrill*, 513 F.3d at 1305–06; *Williams*, 445 F.3d at 1309–10. We maintained unflaggingly that "the law requires only that the jury find the doctor prescribed a drug . . . not 'in the usual course of professional practice'"—not that the doctor subjectively knew she was acting outside the practice of medicine. *Abovyan*, 988 F.3d at 1308. We rejected jury instructions that attempted to say otherwise. *United States v. Joseph*, 709 F.3d 1082, 1097 (11th Cir. 2013); *see also United States v. Ruan*, 966 F.3d 1101, 1167 (11th Cir. 2020) ("This Court has repeatedly rejected [jury] instructions . . . [that] failed to include the objective standard by which to judge the physician's conduct."). And we turned away attempts to have us revisit the question sitting en banc. *See* Order Den. Pet. for Panel Reh'g or Reh'g En Banc, *United States v. Ruan*, No. 17-12653 (11th Cir. Nov. 4, 2020). What is more, there was no indication during this trial that the Supreme Court might unwind that precedential juggernaut. The jury here reached its verdicts more than two years before the Supreme Court granted certiorari in *Ruan II*. Requiring litigants to propose jury instructions inconsistent with established circuit precedent on the off-chance of Supreme Court intervention would not promote the invited-error doctrine's purpose. By acknowledging at trial that under our law "[w]hether the Defendant acted outside the usual course of professional practice is to be judged objectively," Doc. 320 at 37, Santos demonstrated neither "a lack of diligence," nor a desire to mislead the district court, "but merely a want of clairvoyance." *Joseph v. United States*, 135 S. Ct. 705, 706 (2014) (Kagan, J., respecting the denial of certiorari).

The government's position diverges as well from broader principles governing our review. In this criminal appeal, applying the doctrine would undermine the principle that "[d]ecisions of the Supreme Court construing substantive federal criminal statutes must be given retroactive effect." *United States v. Peter*, 310 F.3d 709, 711 (11th Cir. 2002); *see also Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final . . . ."). And it would be inconsistent with our approach in other contexts. For instance (subject to plain error review), we allow an appellant to raise new arguments based on intervening precedent. *United States v. Durham*, 795 F.3d 1329, 1330–31 (11th Cir. 2015) (en banc). Similarly, in the 28 U.S.C. § 2255 context we excuse procedural default—which, like invited error, operates as a complete bar to review—when there has been an intervening change in the law, despite the strong finality interests at play in the habeas context. *Seabrooks v. United States*, 32 F.4th 1375, 1384 (11th Cir. 2022). In these ways, we often recognize that the failure to anticipate an abrupt change in precedent is blameless and should not preclude appellate review.

The government points to our decision in *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), to argue that we may not craft an exception to the application of invited error. *Maiz* was a civil case involving RICO claims against a group of companies who engaged in an allegedly fraudulent real estate investment scheme. *Id.* at 650. In 1990, we had adopted one approach to the statute of limitations for a civil RICO claim; other circuits had adopted another. *Compare*

*Bivens Garden Off. Bldg., Inc. v. Barnett Bank of Fla., Inc.*, 906 F.2d 1546, 1554 (11th Cir. 1990) (adopting one accrual rule), *with Rotella v. Wood*, 147 F.3d 438, 440 (5th Cir. 1998) (adopting another accrual rule). Ten years later, the Supreme court settled the debate, overturning our civil RICO accrual rule. *Rotella v. Wood*, 528 U.S. 549, 553–54 (2000).

Against that backdrop, the defendants in *Maiz* raised the four-year limitations period for civil RICO claims as an affirmative defense. 253 F.3d at 676; *see also Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (establishing limitations period). To define that affirmative defense, the defendants crafted and proposed a jury instruction consistent with our accrual rule in *Bivens Garden*, which the district court adopted. *Maiz*, 253 F.3d at 676. The jury then rejected the defense and found the defendants liable. *Id*. While their appeal was pending, the Supreme Court decided *Rotella* and clarified the accrual rule for a civil RICO claim. *Id*. at 676–77.

The defendants argued that invited error does not apply when a jury "instruction is rendered incorrect by an intervening change in the governing law" and that "*Rotella* [was] such a change in the law." *Id*. at 677. We did not reject such a rule outright; rather, we determined that *Maiz* was not "an appropriate [case] to carve out an exception to the invited error rule." *Id*. We noted that the defendants in *Maiz* had not shown "that the district court's instruction was probably responsible for an incorrect verdict." *Id*. (internal quotation marks omitted). And the defendants had not shown that

theirs was the "exceptional" civil case justifying reversal on plain error review. *Id*. We also observed that the defendants in *Maiz* "had reasonable grounds for declining to propose—and, if necessary, stating an objection to—the [accrual] instruction that instead they asked the court to give." *Id*.

Unlike *Maiz*, we view this as the appropriate case to recognize an exception to the ordinary rule. The change in law asserted in *Maiz* concerned a limitations defense to a civil action; in contrast, this case involves the substantive elements of a criminal offense. And, as we conclude below, on this case's facts we harbor grave doubts that the jury would have reached the same outcome had it been properly instructed. Moreover, distinct from *Maiz*, where the defendant was solely responsible for the challenged instruction, the government bears some of the blame for this error, too. Our review of the record indicates that although the government is correct that the defense proposed language to which it now objects, the government proposed the same language. This was unsurprising because—as the government noted in its proposed jury instructions—it was the very same language we had approved in at least four prior cases. The defense did not craft this error itself.

To be clear, we are not authorizing a free-roving change-in-law exception to the rule of invited error. We hold only that on the facts of this case—a criminal appeal involving an instructional error in defining a substantive offense flowing directly from our long-standing and clear precedent and attributable to both parties—we will not invoke the doctrine.

Because we reject the government's invitation to apply the doctrine of invited error, we instead review the district court's jury instructions for plain error.[6] *See Greer v. United States*, 141 S. Ct. 2090, 2096 (2021). A defendant bears the "burden of establishing entitlement to relief for plain error." *Id*. at 2097 (internal quotation marks omitted). To do so, a defendant must show four things: "First, there must be an error. Second, the error must be plain. Third, the error must affect substantial rights, which generally means that there must be a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Id*. at 2096 (internal quotation marks and emphasis omitted). Fourth—if a defendant makes these first three showings—we consider whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (internal quotation marks omitted) (alteration adopted). Meeting this test is "difficult." *Greer*, 141 S. Ct. at 2097 (internal quotation marks omitted). Nevertheless, after considering each required showing in turn, we conclude that we must vacate Santos's § 841 convictions.

Taking the first two showings together, the district court's instruction was error, and the error is plain. Consistent with our since-overruled precedent, the district court instructed the jury that

---

[6] Santos and the government agree that if the invited error doctrine does not apply, then plain error does.

26                   Opinion of the Court                20-13973

to obtain a conviction under 21 U.S.C. § 841, the government
needed to prove:

> First, that the defendant distributed, dispensed and
> caused to be distributed and dispensed the controlled
> substances as charged; and [second], that at the time
> of the distribution and dispensing, the defendant
> knew that he was distributing and dispensing a con-
> trolled substance not for a legitimate medical purpose
> and not in the usual course of professional practice.

Doc. 392 at 181–82. Immediately after, the district court told the
jury that "[w]hether the defendant acted outside the usual course
of practice is to be judged objectively by reference to standards of
medical practice." *Id*. at 182. The court distinguished this question
from whether the defendant acted for a legitimate medical pur-
pose, which was to be judged "subjective[ly]." *Id*. The court also
gave a "good faith" instruction. *Id*. at 177. Specifically, it instructed
the jury that it could consider whether the defendant's "conduct
[was] in accordance with what the physician believe[d] to be proper
medical practice" as a defense. *Id*. at 178. But the district court lim-
ited this defense to the § 846 conspiracy charge (because it had an
element of willfulness) and the "legitimate medical purpose"
prong of the § 841 substantive counts. *Id*. at 177. It did not apply
this instruction to the usual course of professional practice prong
of the § 841 counts: the district court instructed the jury that it
must not consider "what [Santos] believe[d] to be proper medical
practice," *id*. at 178, under the usual course of professional practice
prong.

Under our decisions in *Ruan III* and *Heaton*, this instruction was error, and the error is plain. *Greer*, 141 S. Ct. at 2096. "An error is plain if it is obvious and clear under current law." *United States v. Johnson*, 981 F.3d 1171, 1179 (11th Cir. 2020) (internal quotation marks omitted). Current law for this purpose includes intervening decisions: "an intervening decision by this Court or the Supreme Court squarely on point may make an error plain." *United States v. Jones*, 743 F.3d 826, 829–30 (11th Cir. 2014) (internal quotation marks omitted); *see also Dell v. United States*, 710 F.3d 1267, 1273 (11th Cir. 2013).

In *Ruan III*, we concluded that a district court's jury instruction was error because it "inadequately conveyed the required mens rea to authorize conviction under § 841(a)." *Ruan III*, 56 F.4th at 1298. Although the jury instruction in *Ruan III* conveyed that the defendants had to act "knowingly and intentionally" when they "dispensed the controlled substance," it did not make clear that the same requirement applied to the authorization prong. *Id.* at 1297. That was so even though the jury instruction in *Ruan III* did not state outright that "[w]hether the defendant acted outside the usual course of practice is to be judged objectively." Doc. 392 at 182. It merely left open the possibility.

In *Heaton*, we confronted a jury instruction that—like the one the district court gave here—stated that "whether [the defendant] dispensed the controlled substances outside the usual course of professional practice is to be judged objectively." 59 F.4th at 1241 (internal quotation marks omitted). We concluded this instruction

was error under *Ruan II* because "this instruction allowed the jury to convict [the defendant] without considering whether he knowingly or intentionally issued prescriptions outside the usual course of professional practice." *Id.*

In sum, *Ruan II* holds that a defendant acts outside the "usual course of professional practice" under 21 U.S.C. § 841 only when a knowing or intentional scienter requirement is satisfied. *Ruan II*. 142 S. Ct. at 2375. Applying that holding in *Ruan III* and *Heaton*, we concluded that a district court errs by instructing a jury to "apply an objective standard to the outside the usual course of professional practice requirement," *Heaton*, 59 F.4th at 1240 (internal quotation marks omitted), or failing to "convey that a subjective analysis [is] required," *Ruan III*, 56 F.4th at 1297.

It is true that the district court's instruction required the government to prove that Santos "knew that he was distributing and dispensing a controlled substance not for a legitimate medical purpose and not in the usual course of professional practice." Doc. 392 at 181–82. But many other aspects of the instruction undercut the idea that this knowledge requirement applied to the "usual course of professional practice" prong. Although the district court repeatedly clarified that the jury had to consider Santos's subjective intent to determine whether he acted without legitimate medical purpose, it juxtaposed this requirement with an instruction that "[w]hether the defendant acted outside the usual course of practice is to be judged objectively by reference to standards of medical practice." *Id.* at 182. And it instructed the jury not to consider

whether Santos acted in good faith when determining whether he acted outside the usual course of practice. Taken as a whole, the jury instructions failed to adequately convey that a defendant acts outside the "usual course of professional practice" under 21 U.S.C. § 841 only when a knowing or intentional scienter requirement is satisfied. *See Christopher v. Cutter Lab'ys*, 53 F.3d 1184, 1191 (11th Cir. 1995) (We "examine[] jury instructions as a whole to determine whether they fairly and adequately addressed the issue and correctly stated the law.") This failure is clearly and obviously (and thus plainly) error under *Ruan II*, *Ruan III*, and *Heaton*. *Johnson*, 981 F.3d at 1179.

Next, we consider whether the error affected Santos's substantial rights—that is, whether there is "a reasonable probability that, but for the error, the outcome of the proceeding would have been different." *Greer*, 141 S. Ct. at 2096 (internal quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. 668, 694 (1984); *see also United States v. Dominguez Benitez*, 542 U.S. 74, 81–82 (2004) (applying *Strickland*'s reasonable probability prejudice standard to plain error review). A reasonable probability is less than a preponderance. *See Holland v. Jackson*, 542 U.S. 649, 654 (2004). But if a "defendant's guilt would have been clear under the correct instruction, he loses under the substantial rights third prong of plain error review." *United States v. Iriele*, 977 F.3d 1155, 1179 (11th Cir. 2020). Because we lack confidence that the outcome of Santos's trial would have been the same on the § 841 counts but for

the erroneous jury instruction, we conclude the error affected Santos's substantial rights.

Consistent with our precedent, the district court instructed the jury that it could consider whether a prescription was authorized based on disjunctive reading of the term not for a legitimate medical purpose and not in the usual course of professional practice. *See Heaton*, 59 F.4th at 1239–40; Doc. 392 at 183 ("[I]f only one of the alternatives is proved beyond a reasonable doubt, that is sufficient for conviction . . . ."). In other words, the jury was allowed to convict Santos *either* because he wrote a prescription that was not for a legitimate medical purpose *or* because it was not in the usual course of professional practice; the jury did not need to find both. As the government put it to the jury, "if you find that there might have been a legitimate medical purpose to a prescription but you think Dr. Duldulao or Dr. Santos still issued it outside the scope of professional practice, they are guilty." Doc. 393 at 47. The jury's verdict form did not specify which theory it relied on when it convicted Santos. So the jury could have rested its convictions solely on an impermissible theory of liability: that Santos's actions did not comply with objective professional norms of medicine. Under the circumstances, we think this possibility is great enough to "undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694.

Two principal reasons support our conclusion. First, the government's trial presentation emphasized the theory that Santos's actions deviated from objective professional norms of

medicine, giving the jury reason to convict Santos on an impermissible theory of liability. Second, the jury's split verdict on the § 841 counts against Santos illustrates that the jury viewed this case as a close call—not a slam dunk. *C.f. Iriele*, 977 F.3d at 1179 (a defendant's substantial rights are unaffected by instructional error if "the defendant's guilt would have been clear under the correct instruction").

At trial, the government told the jury that "prescribing within the scope of professional practice means within generally accepted standards of medical practice, such as under Florida laws or Federal Rules and regulations." Doc. 393 at 30. It put on an expert witness (Dr. Chaitoff) to elaborate on those standards. And it told the jury Santos transgressed them.

Over four days of testimony, Dr. Chaitoff outlined standards that, in his opinion, constituted the relevant standards of medical practice. For instance, Dr. Chaitoff told the jury that a doctor who, "knowing that a patient is intentionally diverting," nevertheless "issue[s] them a prescription for a controlled substance" acts outside "generally acceptable medical practice." Doc. 388 at 21. The same is true, he opined, for a doctor who "exchange[s] . . . controlled substance for monetary remuneration" or violates rules contained in "the DEA manual 2006" or "Rule 64B8-9.013"—a provision of the Florida Administrative Code requiring physicians who prescribe controlled substances to manage pain to adopt practices including adequate evaluation, periodic review, and thorough recordkeeping. *Id.*; *see also* Fla. Admin. Code Ann. r. 64B8-9.013.

Dr. Chaitoff also told the jury that Santos violated these standards. He testified that "100 percent" of Santos's patient files "fell below the standard of care" and that in "most of them, prescriptions for controlled substances . . . were not issued in the course of . . . professional practice." Doc. 388 at 20. For example, Dr. Chaitoff testified that when Santos first prescribed Chin—the undercover agent—controlled substances, he relied on "an inadequate history," and a "physical examination" that was "incomplete." *Id.* at 167. He testified that during Chin and Vasilas's first joint visit to Santos (the basis for Santos's conviction on count seven of the second superseding indictment), Santos prescribed controlled substances "outside the scope of professional practice" because Santos failed to take a patient "history, [conduct a] complete physical examination," consider "medical necessity" or "other medications," or address that the medication failed to improve Vasilas's reported pain. *Id.* at 194. Dr. Chaitoff offered similar opinions on later visits Chin and Vasilas made to Santos. *See, e.g.*, *id.* at 213 ("Based upon the lack of history, lack of physical examination, lack of discussion of any alternative medical care . . . those medications were prescribed . . . outside the practice of medicine.") (count nine).

Dr. Chaitoff's testimony was the heart of the government's trial presentation. As the government argued during trial, Dr. Chaitoff's testimony was "critical evidence for purposes of [its] case-in-chief," and without Dr. Chaitoff, the government would struggle "[i]n terms of being able to present [its] case." *Id.* at 86. Indeed, after the district court struck the bulk of Dr. Chaitoff's

20-13973                Opinion of the Court                33

testimony about Duldulao (but not Santos) for violating an in limine order, it entered a judgment of acquittal on most of the substantive § 841 counts against Duldulao. Without Dr. Chaitoff, that aspect of the government's case failed. The jury also took copies of some of the standards Chaitoff testified Santos violated into its deliberations. And in its closing arguments the government put these standards in front of the jury and recounted how Santos violated them, arguing "[t]hat is not the practice of medicine. That's criminal." Doc. 393 at 115. In sum, the government presented its case in a manner that encouraged the jury to convict Santos based on what the Supreme Court has since clarified is an improper view of the scienter requirement under § 841.

Notwithstanding its trial presentation, the government argues that Santos loses on the substantial-rights prong of plain error review because his guilt is clear, even under the correct jury instruction. *See Iriele*, 977 F.3d at 1179. The government relies on circumstantial evidence regarding the clinic's overall operations to argue Santos acted knowingly. That misses the point. For the § 841 counts, the government obtained convictions based on Santos's specific interactions with patients on specified occasions—not the broader conspiracy or the misdeeds of the clinic. *Ruan II* means that the government needed to show that Santos knew he was acting in an unauthorized manner on each of these occasions, not that he knew generally that the clinic was engaging in unlawful activity.

Recall that Santos's three substantive convictions (counts seven, eight, and nine of the second superseding indictment) were

based on a series of specific visits with a DEA agent, Chin, and a confidential informant posing as her boyfriend, Vasilas. Yet the jury acquitted Santos of two counts of substantive violations of § 841 (counts five and six) based on Chin's earlier visits to Santos. The jury convicted Santos on count seven based on prescriptions of oxycodone—but not the also-charged alprazolam (Xanax) prescription. And the jury convicted Santos on counts eight and nine, based on two later visits.

During each of the five visits underlying the indictment, Santos ignored red flags suggesting that Chin (and later Vasilas, too) was engaged in drug-seeking behavior and potentially abusing controlled substances. During the visit that the government charged as count six, Chin told Santos she had been taking more than the prescribed amount of oxycodone, traveling hundreds of miles to HPC, and receiving opioids from multiple sources. Santos responded by writing her a prescription for even more opioids. During the visit that the government charged as count seven, Santos wrote another prescription for Chin even after Vasilas said Chin had been taking pills from him.

But the jury did not respond to this evidence or the evidence of the larger conspiracy by finding that in each instance Santos violated the law: the jury acquitted on two counts, split on the third, and convicted on two further counts. This split verdict demonstrates that the jury did not infer from Santos' general knowledge of the conspiracy that he knew the prescriptions he wrote were always for no legitimate medical purpose or always outside the usual

course of professional practice. If the jury had drawn such an inference, it would have convicted on counts five and six. This seriously undercuts that government's reliance on the general evidence of the conspiracy—rather than evidence specific to the discrete prescriptions that underlie the § 841 counts—to argue that Santos could not have suffered prejudice. The jury's split verdict also suggests that the jury viewed each of the substantive counts as a close call. As we have described, Santos repeatedly ignored red flags that Chin and Vasilas were abusing their prescriptions. But the jury found that, across five charged visits with Chin and Vasilas, Santos only sometimes crossed the criminal line drawn by § 841; other times, he did not. The district court's instructions to the jury allowed it to draw that line short. Under these circumstances, the district court's instructional error "undermine[s] [our] confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694.

The fourth and final prong of plain error review requires us to consider whether the error "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (internal quotation marks omitted) (alteration adopted). This error does.

In the context of sentencing errors, the Supreme Court has explained that "[t]he risk of unnecessary deprivation of liberty particularly undermines the fairness, integrity, or public reputation of judicial proceedings" when the court is responsible for the error. *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). The responsibility is ours: over the last decades, we repeatedly, in

published opinions, upheld jury instructions that misstated the mens rea requirement under 21 U.S.C § 841. *See, e.g., Tobin*, 676 F.3d at 1282–83; *Merrill*, 513 F.3d at 1305; *Williams*, 445 F.3d at 1309–10. A jury then convicted Santos based in part on that misstatement. Santos received a prison sentence on these counts, and "the possibility of additional jail time . . . warrants serious consideration in a determination whether to exercise discretion under Rule 52(b)." *Rosales-Mireles*, 138 S. Ct. at 1907.

Ignoring this error would also undermine the policy interests the Supreme Court articulated in *Ruan II*. The Court emphasized that scienter requirements are fundamental to our criminal law as the element that generally separates merely negligent conduct from conduct worthy of criminal punishment. *Ruan II*, 142 S. Ct. at 2376–77 ("[C]onsciousness of wrongdoing is a principle as universal and persistent in mature systems of criminal law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil" (internal quotation marks omitted) (alteration adopted)).

We will not run the risk that the jury transgressed that line. We vacate Santos convictions under § 841—counts seven, eight, and nine of the second superseding indictment.

### C.    Sufficiency of the Evidence

On remand, the parties again challenge the sufficiency of the evidence for the conspiracy counts under 21 U.S.C. § 846.[7] We again find the evidence sufficient.

A preserved challenge to the sufficiency of the evidence requires us to examine "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). We will affirm a conviction unless there is "no reasonable construction of the evidence" from which the jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005).

The government does not need direct evidence to prove conspiracy; circumstantial evidence can prove each element. The first element, the existence of an agreement, "may be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Azmat*, 805 F.3d at 1035 (internal quotation marks omitted). The second element, knowledge of an agreement, is satisfied if "the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that

---

7 Santos does not challenge the sufficiency of the evidence for his substantive convictions under § 841. We therefore do not address the issue.

knowledge of its character can fairly be attributed to him." *Id.* (internal quotation marks omitted). As for the third element, that the defendant voluntarily joined in the agreement, circumstantial evidence can show a defendant participated in a conspiracy "by showing that he committed acts that furthered the purpose of the conspiracy." *United States v. Iriele*, 977 F.3d 1155, 1172 (11th Cir. 2020). Our cases sometimes merge the first two elements and abbreviate the elements of conspiracy as "knowledge" and "participation." *See, e.g.*, *id.* at 1169–73.

Circumstantial evidence of conspiracy to distribute and dispense controlled substances not for a legitimate medical purpose and not in the usual course of professional practice includes "red flags" that would have put a reasonable doctor on notice of the illegitimacy of the operation. *See, e.g.*, *Azmat*, 805 F.3d at 1036 ("All of the witnesses with medical backgrounds also testified that there was an abundance of red flags that should have tipped off any doctor that his patients were seeking pills."). Where, as here, the defendant is a doctor who allegedly participated in a pill mill conspiracy, we have looked to evidence of the doctor's interaction with patients to conclude "that a defendant distributed a prescription without a legitimate medical purpose and outside the usual course of professional practice." *Joseph*, 709 F.3d at 1104. These aspects include inordinately large quantities of controlled substances prescribed, brief or nonexistent physical examinations, failure to review patient history before prescribing medications, issuance of prescriptions to a patient known to be delivering the drugs to others, and a lack of a logical relationship between the drugs

prescribed and treatment of the allegedly existing condition. *See id.*; *Azmat*, 805 F.3d at 1036.

Viewing the evidence in the light most favorable to the government, *see Monroe*, 866 F.2d at 1365, there were sufficient red flags in evidence to establish the defendants' knowledge of an unlawful scheme. Combined with the evidence of the defendants' own conduct, ample evidence showed that Duldulao and Santos knowingly joined an agreement to unlawfully dispense controlled substances.

At the outset, we briefly address the relationship between *Ruan II* and our analysis. As we explained in *Ruan III*, "a conviction under § 846 requires the jury to find that the defendant[] knew of the illegal nature of the scheme." *Ruan III*, 56 F.4th at 1299. In other words, independent of the scienter requirement applicable to the substantive offense under § 841, our treatment of the elements of a conspiracy under § 846 has always required the jury to find that the defendant knew the object of the conspiracy was "dispensing a controlled substance . . . in an unauthorized manner." *Id.* That is why we previously considered whether the evidence was sufficient for a jury to conclude that both Duldulao and Santos knew of the unlawful nature of the conspiracy they agreed to join: if the defendants lacked subjective knowledge that the prescriptions were unauthorized, they could not appreciate the unlawful nature of the conspiracy. Thus, we restate much of our prior analysis, and we are confident that analysis remains correct following *Ruan II*.

1.      Duldulao's Sufficiency Challenge

Duldulao argues that there was insufficient evidence to support the elements of the conspiracy charge and, specifically, that the red-flag evidence was weak. We agree with the district court that there was sufficient evidence for the jury to find that he knowingly joined an agreement to unlawfully dispense controlled substances. The district court relied on the following types of evidence: HPC owner Ernest Gonzalez's testimony that Duldulao agreed to write narcotics prescriptions; staff and patient testimony about Duldulao's adherence to the plan to write controlled substance prescriptions to most of the clinic's clientele; staff testimony regarding HPC's operations while Duldulao served as Medical Director; patient testimony that confirmed the clinic's standard operating scheme under Duldulao; and Duldulao's statements to his then-girlfriend Kelly Schleisner about the clinic, including that it was a "pain mill." Doc. 376 at 6–9. This evidence was sufficient to establish that Duldulao knowingly and voluntarily joined an agreement to unlawfully distribute controlled substances.

From this evidence, the jury reasonably could have found that the government proved all three elements of the conspiracy charge. As this Court has in other cases, we treat the first and second elements, agreement to commit a crime and knowledge of the agreement, as a single knowledge element here. The jury reasonably could have inferred that Duldulao knew the criminal object of the conspiracy based on Gonzalez's testimony about his interview with Duldulao for the position of Medical Director, HPC staff's testimony about Duldulao's conduct at the clinic, staff and patient testimony about the clinic's patients, and Duldulao's statements to

Schleisner. For the third element, voluntary participation, the jury reasonably could have found from the testimony concerning his conduct and interactions with patients that Duldulao willingly agreed to and did participate in the conspiracy.

First, we turn to the knowledge element. Gonzalez's testimony was evidence that Duldulao knew about the suspicious nature of HPC from the beginning and nevertheless agreed to get involved. During Duldulao's job interview, Gonzalez showed him a file that listed the types of controlled substances HPC had previously prescribed for patients. Gonzalez told Duldulao that patient visits were timed and that it was "expected that he would probably take about ten minutes" for each patient. Doc. 382 at 41. To "expedite things," the staff would write out prescriptions before the patient's visit that Duldulao could sign afterward. *Id*. at 41–42. This is circumstantial evidence of a scheme to get controlled substances into patients' hands as quickly as possible without regard to medical need. From this evidence, a jury could find that Duldulao agreed to join the conspiracy when he agreed to prescribe opiates under those conditions.

Besides what he knew before accepting his position as Medical Director of HPC, in treating his patients Duldulao would have seen that they exhibited signs of drug addiction, which are red flags for doctors. *See Iriele*, 977 F.3d at 1170; *Azmat*, 805 F.3d at 1036. Witnesses described patients as looking like drug abusers—for example, they were "a little too sleepy," slurred their speech, had bloodshot eyes or dilated pupils, had visible track marks, smelled of

marijuana, and "nodd[ed] out" in the waiting room. Doc. 382 at 92, 96. One employee testified that some patients looked "like they were sleepy and like falling when they would walk." Doc. 382 at 155. Another described the waiting room as "[s]ometimes chaos" with "people nodding out." Doc. 384 at 100. One witness testified that he was addicted to drugs while he was a patient at HPC and looked like "death warmed over." *Id.* at 257. Nevertheless, he and others like him left Duldulao's office with prescriptions for opiates and other controlled substances.

Beyond the patients' appearances, Duldulao heard from HPC staff that some patients had tested positive for illegal drugs. Staff also told him that some patients traveled long distances to reach the clinic, bypassing other pain management doctors and spending hours in a car despite their supposed chronic pain. Again, our precedent in *Azmat* warns that these red flags suggest the patients were seeking drugs without a legitimate medical purpose. 805 F.3d at 1036. Yet Duldulao prescribed them the drugs. A jury could reasonably infer that he knew the patients were likely drug abusers and knew that he was participating in a conspiracy to unlawfully prescribe controlled substances.

Other circumstances surrounding Duldulao's presence at HPC allowed a reasonable jury to attribute knowledge of the conspiracy's unlawful character to him. Duldulao knew that the clinic's parking lot was covered with trash, including drug paraphernalia, and that the clinic had little medical supplies or equipment. He knew that the staff had no training for or experience with working

in a medical office, yet they prewrote prescriptions for him to sign. He knew that HPC did not accept insurance: patients could only pay by cash or credit card. And he even told his girlfriend that he worked at a "pain mill." Doc. 386 at 143. The jury therefore could infer that he had "knowledge of the conspiracy due to his presence at" the clinic. *See Azmat*, 805 F.3d at 1036.

Second, the element of active participation in the conspiracy found support in the evidence of Duldulao's conduct and interactions with the patients. Some HPC patients testified that Duldulao did not review their medical history forms and that his physical exams were as brief as two minutes—if they happened at all. *See id.* Duldulao sometimes prescribed combinations of opioids, Xanax, and Soma, drugs "described in the . . . medical literature as the unholy holy trinity for substance abuse." *Iriele*, 977 F.3d at 1170 (internal quotation marks omitted). When he went on vacation, Duldulao signed prewritten and postdated prescriptions and left them with HPC staff so that patients could come in to pick them up without a physician present or any medical exam. *See Joseph*, 709 F.3d at 1090–91 ("[E]very 'legitimate doctor' . . . knows that he may not pre-sign prescriptions."). A jury could reasonably infer from this conduct that Duldulao actively participated in the conspiracy.

Duldulao argues that this evidence was insufficient to support his conspiracy conviction. He points out that Gonzalez did not testify to telling Duldulao that HPC was a pill mill, that the job was contingent on Duldulao's agreement to exclusively write prescriptions for controlled substances, or that the patients would not have

a medical need for these drugs. And, despite his own guilty plea, Gonzalez testified that he "[n]ever" conspired "with Dr. Duldulao to have him write scripts for no legitimate medical purpose." Doc. 383 at 214. But the jury was free to believe parts of Gonzalez's testimony and disregard others. *See United States v. Takhalov*, 827 F.3d 1307, 1321 n.10 (11th Cir. 2016). Thus, the jury reasonably could have found that Duldulao did, in fact, agree to and participate in the conspiracy to unlawfully distribute controlled substances.

Duldulao is correct that the jury heard countervailing evidence. For instance, videos of undercover officers' appointments with Duldulao showed him asking about their medical history and performing a physical exam. In these videos, he asked about their current medications and advised them not to mix the opiates with alcohol. But Duldulao's then-girlfriend Schleisner testified that he told her that he was "pretty sure" some patients were undercover officers. Doc. 386 at 132. Construing the evidence in the government's favor, as we must, we conclude that a reasonable jury could have found that these recorded exams were anomalies based on Duldulao's suspicions that he was dealing with undercover law enforcement and that most of the time he adhered to the agreement to write prescriptions for controlled substances for no legitimate medical purpose and outside the usual course of professional practice.

Duldulao also argues that his conspiracy conviction cannot stand because he was acquitted of the underlying substantive charges. Not so. Juries sometimes render inconsistent verdicts;

inconsistency alone is not a sufficient reason for setting the verdict aside. *See United States v. Powell*, 469 U.S. 57, 64–65 (1984). We have upheld a defendant's conviction where he was found guilty of conspiracy only and not the underlying substantive offenses. *United States v. Brito*, 721 F.2d 743, 749–50 (11th Cir. 1983) ("[I]nconsistency in a jury's verdict does not require reversal."). "[A]s long as the guilty verdict is supported by sufficient evidence, it must stand, even in the face of an inconsistent verdict on another count." *United States v. Mitchell*, 146 F.3d 1338, 1345 (11th Cir. 1998). Having examined the evidence that supports Duldulao's conspiracy conviction and found it to be sufficient, we reject this challenge and affirm the district court.

And, in any event, the jury's verdict was not inconsistent. The § 841 charge on which the jury acquitted Duldulao required the jury to find that Duldulao knowingly distributed a controlled substance in an unauthorized manner on a particular occasion. The jury was reasonably able to find that—based on the evidence at trial—the government had not shown beyond a reasonable doubt that Duldulao violated § 841 on that occasion but had nevertheless knowingly joined a conspiracy to unlawfully distribute controlled substances in the abstract and on other occasions.

### 2.    Santos's Sufficiency Challenge

Turning to Santos, we agree with the district court that there was sufficient evidence to support the jury's finding that he knowingly joined an agreement to unlawfully dispense controlled substances. The district court relied on the following types of

evidence: Gonzalez's testimony, including his admission that "[t]hat's what I'm pleading to," Doc. 383 at 224, when asked on cross examination whether he conspired with Santos; staff and patient testimony about Santos's conduct and interactions with patients; staff testimony about HPC's operations while Santos served as Medical Director, which included brief, timed patient visits, pre-written prescriptions, little to no medical equipment, and no experienced staffers; patient testimony about their experiences, confirming that the clinic's standard operating scheme under Santos featured "high patient volume, long-distance patients, brief medical visits, little to no medical documentation needed to see the doctor, cash payments, no insurance, cursory physical examinations, papered and/or inaccurate patient records, and patients presenting with signs of apparent drug abuse." Doc. 377 at 8.[8] This evidence was sufficient to establish that Santos knowingly and voluntarily

---

[8] The district court also relied on another piece of evidence: Santos's testimony admitting that he agreed to write prescriptions for controlled substances at HPC, despite the many indicators that it was not a legitimate operation. We agree with Santos that the district court erred when it relied on his testimony. When a district court reserves ruling on a motion for a judgment of acquittal made after the government's case-in-chief, the district court's analysis of the evidence and our review on appeal is limited to the evidence the government presented. *United States v. Moore*, 504 F.3d 1345, 1346 (11th Cir. 2007). Because Santos moved for a judgment of acquittal at the close of the government's evidence, the district court had to follow this snapshot rule and judge the sufficiency of the evidence based only on the government's case. But this is harmless error; the remaining evidence was sufficient to deny the motion and convict Santos. *See Barton*, 909 F.3d at 1337.

joined an agreement to unlawfully distribute controlled sub-stances.

Santos argues that the government failed to prove that he knowingly agreed to write illegal prescriptions. As we noted above, the agreement element of conspiracy merges with the knowledge element, and we treat them as a single knowledge requirement. We agree with the district court that there was sufficient evidence to support the jury's finding that Santos knowingly joined an agree-ment to unlawfully dispense controlled substances. Gonzalez's tes-timony shows that Santos knew about the suspicious circum-stances at HPC. Santos's tenure at HPC featured the same red flags that support Duldulao's conspiracy conviction.

Gonzalez's testimony was evidence that Santos knew he was agreeing to work at a clinic with an unlawful criminal purpose. When Gonzalez interviewed Santos for the Medical Director posi-tion, he made it clear that he wanted a doctor who would write controlled substance prescriptions because when "[t]he patients would come in, they wanted their controlled substances." Doc. 383 at 67. Just like he did with Duldulao, Gonzalez showed Santos a file that contained the types of drugs HPC had prescribed. Santos "was okay with all of it except for he didn't like the methadone and the Xanaxes together." *Id.* Gonzalez notified Santos of the "same for-mat" for timed visits as he had done with Duldulao, and Santos agreed to write prescriptions under those conditions. *Id.* at 68. San-tos's job interview presented circumstantial evidence that he knew about the criminal scheme.

Other circumstantial evidence about HPC supported an inference that Santos knew about and agreed to the conspiracy. This evidence included many red flags, which we discussed as to Duldulao and which "all stayed the same" under Santos: the office had minimal medical equipment or supplies; the staff was untrained; patients traveled long distances to the clinic; the parking lot was littered with trash, including syringes; and HPC only accepted cash or credit card—not insurance. Doc. 384 at 117–18. Patients showed signs of drug addiction, including slurred speech, "nodding out," and track marks on their arms. Doc. 383 at 113. Regardless, "they got their medications" from Santos. *Id*. at 115. A jury could reasonably conclude from this evidence that Santos knew the nature of the conspiracy and agreed to join it.

The knowledge element also found support in the evidence of Santos's conduct. Santos, like Duldulao, signed and postdated prescriptions when he went on vacations. Patients did not see Santos while he was on vacation, but they came to HPC and picked up their postdated prescriptions nonetheless. Santos also left blank, pre-signed prescriptions for HPC staff to issue. His conduct supported an inference that he knew he had agreed to participate in the conspiracy to unlawfully distribute controlled substances.

Further, at one point, Santos came into the clinic "real nervous" and told Gonzalez "that [they] had to start dropping the medications" to lower doses. *Id*. at 125. Gonzalez responded that patients who had been taking high doses could not simply decrease their doses overnight; they could suffer a heart attack or a seizure.

Santos began lowering prescription doses anyway, telling Gonzalez there were new guidelines from the federal government to comply with. In fact, the Drug Enforcement Administration (DEA) had recently seized patient records and shut down a clinic Santos's wife operated. The jury could have inferred that Santos was worried that the DEA would raid HPC and discover that he had been prescribing abnormally high doses of controlled substances. *See Azmat*, 805 F.3d at 1028, 1036–37 (upholding the conviction of a doctor who sometimes decreased patients' medications for self-serving reasons).

Although we vacate Santos's § 841 convictions that were based on his interactions with purported patients who were actually government agents, the circumstances surrounding those visits gave additional inferential support to the finding that Santos knew of the unlawful conspiracy.[9] An undercover video with confidential

---

[9] We note the different standards of review for determining whether to vacate these convictions based on the erroneous jury instructions and whether the evidence was sufficient. We vacate these convictions because we lack confidence that the jury would have reached the same outcome but for the district court's erroneous jury instructions regarding the scienter requirement of § 841. But here, assessing the sufficiency of the evidence underlying Santos's § 846 conviction, we view all the evidence in the light most favorable to the government and ask whether there is any "reasonable construction of the evidence" from which the jury could have found the defendant guilty. *Garcia*, 405 F.3d at 1269. The evidence of Santos's conduct—repeatedly ignoring red flags suggesting Chin and Vasilas were abusing controlled substances and writing them prescriptions anyway—underlying counts five through nine could reasonably be construed to support the inference that Santos knowingly

informant Vasilas showed that when Santos asked how Vasilas's supply of narcotics had held up in the months since his last visit, Vasilas said, "I know that I'm not supposed to be saying this but I had to ask friends and family, you know, to help me out." Doc. 372-213 at 2:30–2:50. Santos gave him prescriptions anyway—in fact, Santos gave him three months' worth of prescriptions, made him pay three times as though he were coming back in for two follow-ups, and let his girlfriend pick up his prescriptions, even though Vasilas had just admitted to sharing medication. When Chin asked for an increase in her dosage, Vasilas told Santos "I know we're not supposed to talk about this, doc, but, you know, . . . she runs out because it's not enough for her, so I have to help her out some-times." *Id.* at 15:30–15:38. These admissions showed that the patients were diverting their medication, a serious red flag that suggested they were abusing drugs. *See Azmat*, 805 F.3d at 1032; *Joseph*, 709 F.3d at 1090. But Santos did not even react. Instead, he gave his patients the increased quantities they wanted.

Santos contends that "patient testimony and resort to red flags cannot mend the evidentiary gap [as to an agreement] because it does not show any agreement between Dr. Santos and Gonzalez." Santos Appellant's Br. at 54. We disagree. Just as with Duldulao, the jury was entitled to rely on "inferences from the conduct of the alleged participants or from circumstantial evidence of

---

participated in a conspiracy to distribute controlled substances without authorization. So this conduct remains relevant to a sufficiency analysis notwithstanding our conclusion that his § 841 convictions cannot stand after *Ruan II*.

[the] scheme" to find an agreement. *Azmat*, 805 F.3d at 1035 (internal quotation marks omitted). Gonzalez's testimony, the multiple red flags, and Santos's conduct together constitute sufficient evidence that Santos agreed to work at a pill mill and unlawfully distribute controlled substances. A reasonable jury could find from this evidence that Santos agreed to be part of a conspiracy to distribute controlled substances with no legitimate medical purpose and outside the scope of professional practice. We reject his challenge to the sufficiency of the evidence supporting his conspiracy conviction.

### D.    Dr. Chaitoff's Expert Testimony

To meet its burden of proving that a doctor knowingly issued prescriptions with no legitimate medical purpose or outside the usual course of professional practice, the government often uses the testimony of a medical expert witness to help satisfy its burden. *See, e.g.*, *Azmat*, 805 F.3d at 1036. But we have also held that expert medical testimony is unnecessary for a conviction. *Joseph*, 709 F.3d at 1100. In this case, the government called an expert witness, Dr. Chaitoff, who testified about the definitions of "legitimate medical purpose" and "the usual course of professional practice."

Although Santos failed to raise these objections before the district court, he argues to us now that Dr. Chaitoff's testimony violated the rules of evidence in two ways: first, by opining on Santos's subjective mental state, and second, by reaching a legal conclusion. Reviewing Santos's arguments under the standard of plain

error, we conclude the district court's decision to admit the testimony was not contrary to binding precedent directly resolving these legal issues. *United States v. Lejarde–Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003). Therefore, we discern no plain error.

A district court may admit expert testimony that "help[s] the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). Generally, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). But "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). Rule 704 bars a witness from giving legal opinions (e.g., "the defendant broke the law") and from discussing culpable mental states (e.g., "and he did it knowingly"). An expert witness can give his opinion about an ultimate issue so long as he does not tell the jury what result to reach. *See* Fed. R. Evid. 704 advisory committee's note. There is a difference between opining on an ultimate issue and impermissibly directing the jury to a result, however. *See United States v. Grzybowicz*, 747 F.3d 1296, 1310 (11th Cir. 2014).

We reject Santos's first argument—that Dr. Chaitoff's testimony violated Federal Rule of Evidence 704(b) and impermissibly opined on Santos's subjective mental state—because it is unsupported by the record. Although Dr. Chaitoff testified about Santos's

conduct and his professional opinion of that conduct, he did not speculate about what was going on in Santos's mind.

Santos also fails to show that it was plain error to admit Dr. Chaitoff's testimony even though the testimony reached the ultimate issue of whether Santos prescribed drugs for no legitimate medical purpose and outside the usual course of professional practice—the standards of medical care relevant here. *See* 21 C.F.R. § 1306.04(a). To summarize Dr. Chaitoff's testimony, he first gave background testimony about these standards, explaining that he derived their meanings from the DEA manual, state and federal regulations, and his own pain management practice. Giving examples from his experience, he explained the process he follows before prescribing controlled substances as follows: finding out who referred the patient; verifying that the patient has insurance; detailing the patient's pain complaints and medical and social history, touching on whether there is a history of substance abuse; and completing an extensive physical examination. Before starting a patient on controlled substances, he discusses the medication's risks and counsels the patient about alternative pain management treatments. He emphasized that there is no one-size-fits-all approach to treating a patient's pain.

He also testified about red flags that would warn him that patients might be abusing their medication: patients with no medical records or no referral, those who traveled long distances, and those who shared their medication or ran out early. These are all examples of patients who would prompt further investigation,

according to Dr. Chaitoff. He found red flags when he watched videos of undercover officer Chin and confidential informant Vasilas visiting Santos's office. Santos had prescribed opiates to Chin for four months. She then missed two months of appointments, which, Dr. Chaitoff testified, would prompt most doctors to ask her how she had been managing the pain without medication and whether she had gone through withdrawal.

Dr. Chaitoff also noted that it is unusual for a doctor to see a couple together and perform a brief physical exam on both simultaneously, as Santos did in the video. Reviewing Santos's notes, Dr. Chaitoff testified that there was little documentation about the results of the physical examinations and why the injuries warranted treatment with controlled substances. Strikingly, Vasilas said that Chin had taken some of his medication, clear evidence of diversion that Santos did not follow up on. Instead, he increased her quantity of oxycodone tablets. Dr. Chaitoff gave his opinion about an ultimate issue when he testified that, at that visit, Santos prescribed Chin and Vasilas controlled substances for no legitimate medical purpose and outside the scope of professional practice. Dr. Chaitoff came to the same conclusion about the pair's two other visits.

Although we vacate Santos's convictions under § 841 based on those three patient visits, the jury also considered Dr. Chaitoff's testimony when it convicted Santos on the § 846 conspiracy charge, a conviction we affirm. It was not plain error to admit Dr. Chaitoff's ultimate-issue evidence. Our precedent allows medical experts to testify about the ultimate issue of the appropriate

standard of care. In *Azmat*, the government's medical expert testified that the patients exhibited an "abundance of red flags" and opined that the doctor did not write prescriptions for them for a legitimate medical purpose or in the usual course of professional practice. 805 F.3d at 1036. The defense's medical expert concluded that the doctor "act[ed] appropriately under medical standards," but the jury determined that the government's expert was more credible and convicted the defendant. *Id.* We accepted both experts' testimony as properly admitted and affirmed the doctor's conviction. *See id.* at 1042–44, 1049. Just like in *Azmat,* it was not plain error here for the district court to admit Dr. Chaitoff's testimony for the jury's consideration.

*Ruan II* does not undermine that conclusion. As Santos concedes, *Ruan II* "left the door ajar about how to prove mens rea." Supp. Br. of Appellant Santos at 13. But a finding of plain error must be justified by on-point authority. *Lejarde–Rada*, 319 F.3d at 1291. If anything, *Ruan II* weakens an ultimate-issue objection to testimony of the kind offered by Dr. Chaitoff. *Ruan II* makes clear that the mere fact a doctor acts outside the course of professional practice or without a legitimate medical purpose does not suffice for a conviction under § 841: "the Government must prove beyond a reasonable doubt that the defendant knew that he or she was acting in an unauthorized manner, or intended to do so." *Ruan II*, 142 S. Ct. at 2375. Thus, post-*Ruan II*, a jury that accepted Dr. Chaitoff's testimony as true would not be required to convict. So *Ruan II* distances a medical expert's opinion on whether a doctor acted without a legitimate medical purpose or outside the course of

professional practice from the question of guilt under § 841. Santos cannot show plain error.

### E.    Santos's Motion to Strike Dr. Chaitoff's Testimony

During trial, Dr. Chaitoff offered basically two types of testimony: first, he explained the medical and regulatory standards that govern the prescription of controlled substances, and second, he offered his opinion on whether Duldulao's and Santos's conduct conformed to those standards. During trial, a problem emerged. In forming his opinion about Duldulao, Dr. Chaitoff had relied on material relating to Duldulao's activities at a second pain clinic and alleged pill mill that the district court excluded from evidence after granting a motion in limine. Dr. Chaitoff's reliance on these excluded materials put Duldulao in a bind. He could not fully cross-examine Dr. Chaitoff on the basis for his opinion without also discussing material the district court excluded. Duldulao and Santos both moved to strike Dr. Chaitoff's testimony. The district court granted Duldulao's motion in part, striking Dr. Chaitoff's testimony regarding Duldulao's conduct but not his testimony regarding the general standard of care nor his testimony regarding Santos, about whom Dr. Chaitoff had not considered excluded evidence.

Santos argues the district court abused its discretion by not striking Dr. Chaitoff's testimony about him, too. We disagree. Although the court deemed Dr. Chaitoff a "less than reliable witness" because of his memory problems and lack of candor, it was within the court's discretion to deny Santos's motion to strike. Doc. 388 at 97. Only one topic was off-limits in Santos's cross-examination:

the evidence about Duldulao's other pain clinic that the court's in limine order excluded. That limit did not substantially affect Santos's right to cross-examine the witness; Dr. Chaitoff had not relied on the excluded evidence in forming his opinions about Santos and the general standard of care, and Santos could mitigate any prejudice from Dr. Chaitoff's other shortcomings through thorough cross-examination. *See United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017).

### F.    Santos's Sentence

Santos previously challenged his sentence, and we affirmed. On remand, we need not reconsider the merits of his arguments in light of *Ruan II*. Because we vacate Santos's convictions on counts seven, eight, and nine, we vacate his sentence, too. *See United States v. Fowler*, 749 F.3d 1010, 1015–16 (11th Cir. 2014) (explaining that, on direct appeal, "we have routinely, without hesitation and as a matter of course, vacated entire sentences and remanded for resentencing on all surviving counts after vacating a conviction or sentence on some, but not all, of the counts" because a "multicount sentence is a package" (internal quotation marks omitted)).

### IV.    CONCLUSION

For the above reasons, we **AFFIRM** Duldulao's conviction on count one of the second superseding indictment. We **AFFIRM** Santos's conviction on count one, **VACATE** Santos's convictions on counts seven, eight, and nine, **VACATE** Santos's sentence, **REMAND** for resentencing, and **REMAND** for a new trial on counts seven, eight, and nine.